**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ELAINE L. CHAO, Secretary of the United States Department of Labor, | ) ) ) | |
| Petitioner, | ) ) | JUDGE GETTLEMAN |
| v. | ) ) | MAGISTRATE JUDGE SUSAN COX |
| OPERATING ENGINEERS LOCAL 150 APPRENTICESHIP FUND, | ) ) | NO. 08 C 3075 |
| Respondent. | ) ) ) | |
| ELAINE L. CHAO, Secretary of the United States Department of Labor, | ) ) ) | |
| Petitioner, | ) ) | NO. 08 C 3091 |
| v. | ) ) | |
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, | ) ) ) | |
| Respondent. | ) ) ) | |

**LOCAL 150'S RESPONSE TO THE DEPARTMENT OF LABOR'S**
**PETITION TO ENFORCE *SUBPOENA DUCES TECUM***

Respondent, International Union of Operating Engineers, Local 150, AFL-CIO ("Local 150" or the "Union"), through its attorneys, for its response to the Secretary of Labor's petition to enforce *subpoena duces tecum*, and this Court's June 12, 2008 Order to Show Cause, states as follows.[1]

---

[1] The Court's order of June 12 was entered in Action No. 08 C 3075, which involves the Department of Labor's *subpoena duces tecum* to the Operating Engineers Local 150 Apprenticeship Fund (the "Apprenticeship Fund")—a separate legal organization from the Union itself, with separate legal counsel. No order has been entered in Action No. 08-C-3091, which was brought to enforce the Department of Labor's subpoena against the Union. Nonetheless, as the June 12 Order references "International Union of Operating Engineers, Local 150" (*i.e.*, the Union) as a "respondent" and also references the date of the *subpoena duces tecum* served on the Union, the Union files this response out of an abundance of caution.

1891818_4

## <u>INTRODUCTION</u>

The Department of Labor ("DOL") initiated an investigation into the Union's August 2007 election based on the misinformation contained within a January 2008 complaint filed by Joseph Ward—a disgruntled former Union officer and employee—following his losing bid for President/Business Manager of the Union. Ward's complaint was co-signed by three other losing candidates, all of them members of the "Team 150" election organization. By giving credence to Ward's/Team 150's inaccurate information and inflammatory allegations, the DOL has taken on the role of unwitting pawn. Ward's recent DOL complaint is just the latest tactic in an ongoing campaign to wrongfully interfere with and disrupt the legitimate business of the Union. Indeed, the misconduct of Ward and his Team 150 associates, which includes the theft of the Union's membership list to obtain an unfair advantage in the 2007 election, has been serious enough that the Union was forced to file suit against them in federal court last year, and has since obtained a permanent injunction, requiring them to return the list and destroy all copies.

While the DOL is obligated to take allegations of election misconduct seriously and perform an investigation, the *subpoena duces tecum* at issue before this Court overreaches the DOL's investigative and subpoena powers. The DOL's document requests go far beyond the bounds of what is relevant or necessary to its investigation. In addition, the DOL unreasonably seeks highly confidential and sensitive personal information about the Union's members, which it either cannot or will not protect from public disclosure. Disclosure of this information in response to a Freedom of Information Act ("FOIA") request or otherwise could be used by Ward (or anyone else) to further disrupt the business of the Union. Worse, such disclosure would place the Union's members—who are blameless here, regardless of the veracity of the allegations that led to the DOL's investigation—at real risk of identity theft and other crimes.

In its Petition and supporting brief, the DOL relies on its broad investigative powers. While the Union does not deny that the DOL has the authority to investigate potential violations of law, the DOL's investigative and subpoena powers are not limitless. Like any administrative agency, the DOL's desire for information is balanced against the burden of compliance to the subpoena respondent. In this case, the DOL's requests for highly sensitive personal information, when combined with its refusal to protect that information from disclosure, are so oppressive and unreasonable as to tip the scales against enforcement of the DOL subpoena. Accordingly, the Union respectfully suggests that this Court deny the DOL's petition for enforcement and quash the *subpoena duces tecum* at issue. In the alternative, and as discussed further below, the Union asks the Court to issue a protective order to guard the confidentiality of the Union information sought by the DOL.

## PROCEDURAL AND FACTUAL BACKGROUND

Local 150 is a labor organization representing approximately 22,000 employees in the construction and other industries who live and work in Illinois, Indiana, and Iowa. The Union's principal office is in Countryside, Illinois, and from that office the Union maintains a password-protected, restricted-access list of Local 150 members, including personal information provided by those members (the "Membership List"). The information contained within the Membership List, which includes, *inter alia*, members' names, addresses, unlisted telephone numbers and Social Security numbers, is confidential, highly sensitive and is not known to the public or to the members of the Union generally.

To the best of Local 150's information and belief, in the summer of 2006, Joseph Ward, the Union's former Treasurer and employee, along with one or more of his Team 150 cohorts (most of whom are also former Union employees) conspired to obtain unauthorized access to the Membership List information. Ward and company then unlawfully disclosed the highly-

sensitive personal information contained therein to a number of third parties, including a telemarketing survey company and a printing company.  In light of this activity, the Union was forced to file suit against Ward and his associates in federal court in this District on May 17, 2007 (a true and correct copy of the Second Amended Complaint from that action is attached hereto as Exhibit A).  The Complaint alleges that Ward and others took the Membership List in order to gain an advantage in the 2007 Union election.[2]

In the meantime, the Union held its August 2007 election.  Unhappy with the results, Ward and other losing candidates from "Team 150" served a protest on Local 150 in September of 2007, which was subsequently denied by the Union.  Ward and his associates then appealed to the International Union of Operating Engineers on or about November 14, 2007.  One day later, on November 15, 2007, in resolution of the Union's motion for injunctive relief (attached hereto as Ex. B), Judge St. Eve (who is currently presiding over the Union's lawsuit against Ward and other losing members of Team 150) entered a permanent injunction against Ward and his associates which required them to return the Membership List and destroy all other copies of the list (a true and correct copy of the order is attached hereto as Ex. C).

Forced to turn over the Membership List and frustrated by the Union's denial of their appeal of the election results, Ward and his associates next filed their Complaint with the DOL on January 7, 2008 (attached hereto as Ex. D).  That complaint—which contains thirty separate unsupported allegations of election misconduct—had its intended effect, which was to further interfere with and disrupt the business of the Union.  Without knowledge of Team 150's history of misconduct to put their allegations in proper context, the DOL took the complaint at face value and therefore decided to look into the Union's 2007 election.  In connection with its

---

[2] The Union has also contacted federal law enforcement agencies, including the Federal Bureau of Investigation, with respect to what the Union alleges to be the theft and misuse of the information.

4

investigation, on March 14, 2008 and April 4, 2008, the DOL issued a *subpoena duces tecum* to both Local 150 itself and the Union's Apprenticeship Fund, respectively (a true and correct copy of the subpoena issued to the Union is attached hereto as Ex. E).

Rather than tailor its document requests to the information truly necessary to investigate Ward's complaint, the DOL subpoena to the Union is extremely broad.  In addition to seeking e-mail communications and other information that is not even remotely related to the allegations of Ward's complaint, the DOL seeks personal information of the Union's members that is sensitive, confidential and privileged.  The DOL seeks for the Union to disclose, *inter alia*, the names, addresses, unlisted telephone numbers, Union identification numbers, employment information, membership status, and membership start date of thousands of its members, at various points in time since June of 2007.  The DOL's requests to obtain members' Union identification numbers are particularly troubling, because these numbers are merely the unaltered Social Security numbers of some Union members.

In an effort to settle this dispute, the Union voluntarily provided the DOL with a list of the names and addresses of its members who where mailed ballots during the August 2007 officer election as requested by the DOL.  However, the DOL has indicated that the Union's disclosures are insufficient to comply with the scope of the information requested.  In a further effort to compromise, the Union asked the DOL to provide written assurances that the confidential information contained in the Membership List will be protected from disclosure to third parties, and/or to enter into a protective order in a form similar to that agreed to among the Union, Ward, and the other defendants and entered by Judge St. Eve in the ongoing security breach litigation (a true and correct copy of which is attached hereto as Ex. F).  The DOL

refused.   As such, the Union views the DOL's continued demand for detailed membership information to be unreasonable and clearly excessive.

## <u>LEGAL STANDARDS</u>

The DOL has authority pursuant to 29 U.S.C. § 521(b) and Sections 9 and 10 of the FTC Act to conduct investigations and issue administrative subpoenas such as those issued to the Union.   But the DOL's subpoena powers are tempered by this Court's power to enforce, quash or modify administrative subpoenas.   *EEOC v. United Air Lines, Inc*., 287 F.3d 643, 653 (7th Cir. 2002).   Indeed, the Seventh Circuit has made clear that courts in this circuit "should not merely rubber-stamp the subpoenas that come before them,"   *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1266 (7th Cir. 1982), but instead should thoughtfully consider whether the subpoena as issued is appropriate.

In other words, this Court must weigh the probative value of the information sought by the subpoena against the burden resulting from the enforcement of the subpoena.   *Dow*, 672 F.2d at 1269; *United States v. Lehman*, 887 F.2d 1328, 1335 (7th Cir. 1989).   This balancing test includes an analysis of the "reasons or needs underlying the request" and its probative value against the burden of compliance.   *Dow,* 672 F.2d at 1269-70.   According to the Seventh Circuit, it is "clearly recognized that disclosure may be restricted where it would impose an unreasonable or undue burden on the party from whom production is sought."   *Commodity Trend Serv. v. CFTC*, 233 F.3d 981, 987 (7th Cir. 2000).   The Seventh Circuit further clarified that "what is unduly burdensome depends on the particular facts of each case and no hard and fast rule can be applied to resolve the question."   *Id*. (internal quotation omitted);   *see also United Air Lines,* 287 F.3d at 653.

## **ARGUMENT**

In general, the information originally requested by the DOL currently falls into three distinct categories: (i) that which the Union has already voluntarily turned over; (ii) that which the Union cannot turn over; and (iii) that which the Union objects to turning over.  The first category of information includes the names and addresses of thousands of Union members, which the Union has already disclosed to the DOL in a good faith attempt to settle this dispute. The second category represents information that the Union does not have in its possession and cannot obtain, rendering at least some of the DOL's requests moot.  In particular, a number of the DOL's requests seek information about the Union's membership at specific moments in time (*e.g.*, June 30, 2007).  But the information contained within the Union's Membership List is constantly updated, and the old information deleted, as members join or leave the Union, change their place of employment, change their address and contact information, or progress from apprenticeship to journeyman status.  The Union did not keep "snapshots" of this dynamic database for the time periods identified by the DOL, and thus cannot comply with many of the DOL's requests.  In addition and with regard to the e-mail messages requested by the DOL, the individuals identified by the DOL either do not have a Local150.org e-mail account (Mr. Hughes and other Union stewards) or else do not use the one assigned (Mr. Spaeth), and therefore no such responsive e-mails exist to be produced.

The third category of information—that which the Union objects to producing—is the real subject of the DOL's petition and this Response, and includes personal telephone numbers and member identification numbers, which in many cases are the members' Social Security numbers.  This information is simply too sensitive for the Union to disclose.  For all of the reasons below, the Union has good cause for its objection, and such cause represents justification for this Court to deny the DOL's Petition to Enforce.

I. **The Department of Labor's Petition Should be Denied Because the Subpoena At Issue is Oppressive and Unreasonable.**

   A. **The DOL's Document Requests Are Oppressive Because Compliance Would Place the Union and Its Members' Personal Information At Risk.**

The danger in the DOL's current subpoena is that it places member information at risk without offering any explanation as to why detailed membership information is needed or how it will be used. The DOL has refused to enter into any form of protective order and refused to indicate that the Membership List will not be subject to disclosure under FOIA.

The Union is concerned that in the government's possession, the Membership List, which includes names, addresses, unlisted telephone numbers, membership status and union identification numbers, would become available to the general public, including telemarketers, through the DOL's investigation or under a FOIA request. Because the Union membership number is, in many instances, the Union member's Social Security number, untold numbers of the Union's membership could become the easy target of identity theft. The black market value of the Membership List to identity thieves, with the Social Security numbers, is estimated to be in the millions of dollars. Disclosure of the list would also enable non-union contractors to contact union members directly for jobs, undercutting the Union's right to organize and represent its membership.

The Union has a fiduciary duty to protect each individual member's private information that supersedes the DOL's right to subpoena this information. Moreover, the Union is obligated to protect the Membership List by DOL election laws. (Chapter 7, Inspecting the Membership List, Conducting Local Union Office Elections: A Guide for Election Officials, U.S. Department of Labor, 2001).

The Union would face liability from its own members if it turns over their personal information without adequate protections in place. A number of courts have entertained claims

8

involving identity theft as a type of common law negligence action which can be brought against the holder of the private information. *See Bell v. Michigan Council 25 of American Federation of State, County, Municipal Employees, AFL-CIO, Local 1023*, No. 246684, 2005 WL 356306 (Mich. Ct. App. Feb. 15, 2005), appeal denied, 474 Mich. 989, 707 N.W.2d 597 (2005); *Kuhn v. Capital One Financial Corp.*, 18 Mass. L. Rptr. 524 (Mass. Super. Ct. 2004); *Daly v. Metropolitan Life Ins. Co.*, 4 Misc. 3d 887, 782 N.Y.S.2d 530 (N.Y. Sup. Ct. 2004). In *Bell*, the Union members successfully sued the Union itself for negligence in connection with lost membership information and subsequent identity theft. In that case a relatively small union had to pay its members $275,000. A similar claim by members of Local 150 would carry a much larger potential exposure to the Union. The database list is clearly the type of information which merits protection.

### B. The Subpoena is Overly Broad, Unduly Burdensome, and Should Be Quashed.

In arguing that the subpoena at issue here is enforceable, the DOL relies on the half-century old test articulated by the U.S. Supreme Court in *U.S. v. Morton Salt Company*, 338 U.S. 632, 652 (1950), which requires: (1) that the inquiry is within the authority of the agency; (2) the demand is not too indefinite; and (3) that the information sought is reasonably relevant. (*See* the DOL's Brief in Support of the Petition to Enforce, Docket No. 7 ("DOL Brief"), at p. 6). The Union agrees that the *Morton Salt* test must be met, but—as explained by the Seventh Circuit in *Dow Chemical*—the *Morton Salt* test is not a stand-alone analysis. *Dow*, 672 F.2d at 1267; *c.f. Commodity Trend*, 233 F.3d at 987. In other words, in addition to passing the *Morton Salt* test, an administrative subpoena must pass a judicial balancing test, *i.e.*, the probative value of the subpoena must be weighed by the district court in each particular case against the burden of compliance to the responding party. *Dow*, 672 F.2d at 1267. If enforcement of the subpoena

"would impose an unreasonable or undue burden on the party from whom production is sought," then the court has discretion to quash, modify, or restrict the subpoena.  *Id.*

Here, the Union already provided the DOL with the names and addresses of its members that were mailed ballots during the August 2007 officer election, the primary request at issue here.  Therefore, the DOL has sufficient information to contact these individuals and move forward with its investigation.  Providing the DOL with the requested unlisted telephone numbers and member identification numbers, which are in many cases member Social Security numbers, will not significantly assist the DOL in its investigation but will significantly impose on the Union's business and purpose and will significantly expose its members to identity theft.  Therefore, the burden on the Union and its members drastically outweighs the probative value of the disclosure of the information, and the subpoena should be quashed.

In *Dow Chemical*, the Seventh Circuit affirmed the decision of the district court refusing to enforce an administrative subpoena requesting production of data from a university research study.  672 F.2d at 1265-66.  "The basis for the district court's decision was that the subpoenas were unduly burdensome."  *Id.* at 1268.  In affirming the decision, the Seventh Circuit noted that forcing production of the data supporting the research study in its early stages would likely jeopardize the study resulting in a heavy burden not only on those involved in the study but also on the public, which financially supported the study through tax money and which ultimately would gain from the results of the study.  *Id.* at 1269.

Here, as in *Dow Chemical*, there would be a heavy burden imposed on Local 150 itself and its members if the subpoena is enforced.  Requiring Local 150 to disclose sensitive member information, including unlisted telephone numbers and Social Security numbers, will seriously

impair and unduly disrupt the normal operations of the Union and will expose its members to a significantly increased risk of identity theft.

The DOL cites a 1991 Eastern District of Michigan case (*The Friends Social Club v. Dept. of Labor,* 763 F. Supp. 1386, 1390 (E.D. Mich. 1991)) and a 1990 Ninth Circuit case (*Dole v. Local 375,* 921 F.2d 969, 971 (9th Cir. 1990)) in support of its position that the subpoena here is enforceable.  (DOL Brief, pp. 4-5.)  However, these cases are not binding authority on this Court and, in any event, are easily distinguished on the facts from the situation here.  In *Friends Social Club,* the only list involved was a list of the names of contributors to a "flower fund" used to finance one of the candidates—not the entire union membership list, and no more than the contributors' names.  *See* 763 F. Supp. at 1390 ("The parties agree that the requested documents would disclose the names of individual contributors to the various flower funds").  In *Dole*, again the only list involved was the names of individuals who had contributed to a special union fund—not the entire membership list, and not the members' telephone numbers or other personal information.  *See* 921 F.2d at 971 ("The parties do not dispute that the subpoenas encompass documents that would reveal the names of Fund contributors").  Thus, in neither case was the DOL's demand as extensive and invasive as the information called for in this case.  Furthermore, in the *Friends Social Club* case, a DOL officer submitted an affidavit verifying that the information would be maintained in a "restricted" manner, with access granted only on a "need to know" basis.  763 F. Supp. at 1396-97.  Notably, no such affidavit has been submitted here.

## II.  In the Alternative, This Court Should Exercise Its Discretion to Modify the Subpoena And/Or Enter A Protective Order.

"[A] court may take steps to modify investigative subpoenas where they threaten to seriously impair or unduly disrupt the normal operations of the business. In this regard, a district court may impose reasonable conditions and restrictions on the manner and time of production.

The district court's determinations on these matters will not be overturned absent abuse of discretion." *FTC v. Shaffner*, 626 F.2d 32, 38 (7th Cir. 1980) (internal citations omitted).

In this case, the Union submits that the DOL should be bound by a protective order at least as restrictive as that entered by Judge St. Eve in the Union's pending litigation against Ward (*see* Ex. F), and at most the DOL should be allowed to review the documents it has requested only under such a protective order.  In any event, the DOL should assure this Court in writing that the Membership List will be exempted from disclosure pursuant to a FOIA request or otherwise.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Union respectfully asks this Court to deny the Department of Labor's petition and quash the *subpoena duces tecum*.  In the alternative, this Court should issue a protective order requiring the Department of Labor to guard the confidentiality of the information sought and further precluding the Department of Labor from disclosing the Union's Membership List and other sensitive member information pursuant to a FOIA request or otherwise.

Respectfully submitted,

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 150, AFL-CIO


By:  /s/ William J. Cook
                One of their Attorneys


William J. Cook (#0509639)
John J. Arado (#63266)
Katherine K. Ivers (#6284902)
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive
Chicago, Illinois 60606-1229
(312) 201-2000
(312) 201-2555 (facsimile)

Dale D. Pierson (#6183882)
Elizabeth Ann LaRose (#6226722)
International Union of Operating Engineers
6140 Joliet Road
Countryside, Illinois  60525
(708) 579-6663

## <u>CERTIFICATE OF SERVICE</u>

I, William J. Cook, an attorney, hereby certify that I caused a copy of the foregoing

LOCAL 150'S RESPONSE TO THE DEPARTMENT OF LABOR'S PETITION TO ENFORCE

SUBPOENA DUCES TECUM to be served via the CM/ECF electronic filing system on this 9th

day of July, 2008, and thereby served upon counsel of record.

By:  /s/ Katherine K. Ivers

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 150, AFL-CIO,                )

           Plaintiff,                )
                              )

      v.                )        No. 07 C 2779
                              )

JOSEPH P. WARD, THOMAS WARD, ROGER F. )    Judge Amy St. Eve
ALLEN, C. WAYNE SNIDER, RESEARCH CENTER, )
SOMMERS & FAHRENBACH, INC., TEAM 150 )    Magistrate Judge Nolan
PARTY, INC., JOHN DOE MAILING SHOP, AND )
JOHN DOE PRINTER,                )
                              )
           Defendants.                )

### SECOND AMENDED COMPLAINT

Plaintiff, International Union of Operating Engineers, Local 150, AFL-CIO (hereinafter, "Local 150" or the "Union"), for its Complaint against Defendants, Joseph P. Ward, Thomas Ward, Roger F. Allen, C. Wayne Snider, Team 150 Party, Inc. ("Team 150") (collectively, the "Team 150 Defendants"), Research Center, Sommers & Fahrenbach, Inc., John Doe Mailing Shop, and John Doe Printer (collectively, "Defendants"), alleges:

### FACTS

1.     Local 150 brings this action to protect the privacy rights of its members and to protect the Union's assets wrongfully misappropriated and used by Defendant Ward and other Defendants, including, but not limited to the Union's proprietary membership information including home addresses, telephone contact numbers, social security account numbers, and non-public information concerning past, present, and potential Union members.

**Plaintiff**

2.      Local 150 is a labor organization representing approximately 22,000 employees in the construction and other industries within the geographical boundaries of eight district offices in Indiana, Illinois, and Iowa.   The Union's principal office is located at 6200 Joliet Road, Countryside, in Cook County, Illinois.  The Union additionally has district offices located in other Illinois cities, as well as Indiana and Iowa.

3.      The Union's computer and network systems are used in interstate and foreign commerce and communications and are protected computers as defined in 18 U.S.C. § 1030 of the Computer Fraud and Abuse Act.

**Defendants**

4.      Joseph P. Ward ("Ward") resides at 20923 South River Road, Shorewood, in Will County, Illinois.  Ward was the elected Treasurer of Local 150 and held that position from 1986 to 2007.[1] Ward is seeking election to Local 150's position of President/Business Manager in the upcoming election in August of 2007 as a member of the Team 150 Party.

5.      Thomas Ward is Joseph P. Ward's nephew and the owner of email account ward5120@sbcglobal.net.  Thomas Ward resides at 712 Cambridge Lane, Shorewood, in Will County, Illinois, approximately 0.57 miles from Joseph P. Ward.  Thomas Ward is a supporter of the Team 150 Party.

6.      Roger F. Allen ("Allen") resides in Winnebago County, Illinois. Until August 2006, Allen was Local 150's Apprenticeship Coordinator.   Allen is seeking election to Local

---

[1] President-Business Manager William Dugan suspended Ward on January 10, 2007, for repeated violations of Union policies.

150's position of Recording Corresponding Secretary in the upcoming election in August of 2007 as a member of the Team 150 Party.

7.     C. Wayne Snider ("Snider") resides in Lake County, Indiana. Until 2006, Snider was a Local 150 Business Representative. Snider is seeking election to Local 150's position of Financial Secretary in the upcoming election in August of 2007 as a member of the Team 150 Party.

8.     Team 150 Party, Inc. is an Illinois corporation with its principal place of business located in Will County, Illinois. Team 150 Party, Inc. is an organization supporting the election of Ward, Snider, and Allen to the offices they are seeking within Local 150 in the upcoming election in August of 2007.

9.     Research Center is, on information and belief, a corporation in, *inter alia,* the telemarketing business employed by the Team 150 Defendants to perform unauthorized telephonic surveys, with its principal place of business in Florida.

10.    Sommers & Fahrenbach is, on information and belief, an Illinois corporation, in the business of, *inter alia,* providing printing services, and has been employed by Team 150 Defendants to perform unauthorized printing and mailing services. Sommers & Fahrenbach has a principal place of business in Chicago, Illinois.

### Local 150's Secret and Confidential Membership List

11.    To perform its obligations to, and generally do business with, Local 150's members and their employers with which the Union maintains contractual relationships, Local

150 has compiled and maintained an electronic confidential list of Local 150's members containing information provided by Local 150's members (the "Membership List").

12.     The Membership List contains information that Local 150 members have provided, including, but not limited to, name, address, home and other telephone numbers, social security numbers, and other personal information related to their employment. One significant purpose of the list, and the reason why members are willing to provide the information, is so that the Union can contact members when job opportunities become available.

13.     The Membership List contains information not known to the public or to the members of Local 150 generally. Additionally, the Union spent and continues to spend considerable human and financial resources in the creation and maintenance of the Membership List. Accordingly, the Membership List constitutes something of value under Title 18 U.S.C. §§ 1030(a)(4).

14.     Local 150 maintains the confidentiality of the Membership List information, including through such means as, *inter alia*, password-protection. The only persons with authorized and routine access to the Union's Membership List are select members of the Union's accounting department (who collect dues) and the Union's dispatchers (who send members to work on jobs, at the request of our signatory contractors). Union rules require that any employee seeking to do a group mailing to members must obtain permission from President-Business Manager Dugan, and only then will a member of the Accounting or Dispatch departments release that information to the employee. The rule applies to the Union's officers, including Ward, as well as other employees, such as lawyers or business agents. The rule has been in effect since at

least 1986 and consistently enforced. The Social Security account numbers of members are never released.

15.     Access to the Union's computer networks is restricted both physically and technically. Security monitoring and auditing of these networks is performed on a continuous basis.

### Procedure for Properly Obtaining Membership Information

16.     During a campaign for Union office, candidates have the right to request that Local 150 facilitate campaign mailings to individuals on the Membership List through a third party. Local 150 facilitates these campaign mailings through the same third party used by Local 150 in its routine Union business.

17.     At no time have any of the Defendants, or anyone acting on their behalf, made a request for Local 150 to facilitate campaign mailings to individuals on the Membership List. Consequently, neither Local 150 nor its agents have provided any Membership List information to any of the Defendants or anyone acting on their behalf.

### Conspiracy to Gain Unauthorized Computer Access to Confidential Membership List and to Misappropriate that Information

18.     Upon information and belief, commencing in the summer of 2006, all or some of the Defendants entered into a conspiracy (the "Conspiracy") to obtain unauthorized access to the Membership List information, to misappropriate the confidential information contained in the Membership List, and to use the same for their campaign for the Local 150 offices they are seeking.

19.     It was further a part of the conspiracy to make the misappropriated Membership List information available to unauthorized third parties, including Team 150, Research Center

Sommers & Fahrenbach, John Doe Mailing Shop, and John Doe Printer to assist the Team 150 Defendants in their campaign efforts.

### Unauthorized Access to Local 150 Servers

20.    In furtherance of the Conspiracy, in or about August 2006, there was a series of unauthorized attempts to access a Local 150 computer server in Romeoville, Illinois. This server is connected to Local 150's main server located in Countryside, Illinois and networks all of Local 150's computers, as well as those of related entities. Some of these attempts recorded the username "ward5120@sbcglobal.net."

21.    In furtherance of the Conspiracy, on or about October 29, 2006, another unauthorized attempt was made to access Local 150's main server in Countryside, Illinois.

22.    Given the nature of the attempts, it is clear that software and related technical devices were employed to assist in the attempts to unlawfully access information on Local 150's computers.

23.    On information and belief, the Defendants either copied without authorization or by exceeding authorized access the Membership List from a Local 150 computer system.

### Damage to Data on Local 150 Servers

24.    On information and belief, and in furtherance of the Conspiracy, certain computer log files and/or log entries on Local 150 Servers were deleted or destroyed by the Defendants .

25.    On information and belief, and in furtherance of the Conspiracy, certain computer log entries pertaining to events on or around October 29, 2006, were deleted or

destroyed on the Local 150 computer system controlling physical access to the Local 150 office located in Countryside, Illinois, by the Defendants.

### Internal Security Investigation and Remediation

26.    Due to acts of Defendants, Local 150 was forced to undertake an investigation into these incidents, thus incurring significant costs.

### The Telephone Survey

27.    In furtherance of the Conspiracy, some or all of the Team 150 Defendants, directly or through other persons disclosed and otherwise transmitted to, *inter alia,* Research Center, John Doe Printer, Sommers & Fahrenbach, and John Doe Mailing Shop secret and confidential Membership List information.

28.    In furtherance of the Conspiracy, beginning on or about November 29, 2006, numerous members of Local 150 received telephone calls from a telemarketing survey company located in Florida – Research Center – regarding the election of Local 150 officers in August of 2007.  Among other things, the callers represented that they were calling on behalf of Local 150.  Local 150 commissioned no such survey.  Some of the Local 150 members contacted by Research Center received calls on telephone numbers that were either unlisted, cellular, or the numbers of friends and family that were provided almost exclusively to Local 150 for inclusion on the Membership List.  Certain members who received calls were on state "Do Not Call" lists.

29.    In furtherance of the Conspiracy, questions asked by Research Center were designed to engender ill-will against the incumbent Union officers and to benefit the Team 150 Defendants.

**The Campaign Mailings**

30.     In furtherance of the Conspiracy, on or about January 21, 2007, some or all of the Defendants caused members of Local 150 to receive campaign mailers in support of the Team 150 Defendants in the upcoming Local 150 election ("Campaign Mailers"). The mailings were not conducted by Local 150's commissioned mail house or print shop, and, while it would have if requested, Local 150 never provided Team 150 with member information to effectuate the mailings. Defendants Sommers & Fahrenbach and John Doe Mailing Shop participated in and arranged for the unlawful mailings and use of the Membership List information.

31.     In furtherance of the Conspiracy, the addresses used for the Campaign Mailers were taken from the Union's proprietary Membership List, as reflected by the fact that several members of Local 150 received the campaign mailings at old or incorrect addresses as they appeared only on the proprietary Membership List. In furtherance of the Conspiracy, in subsequent mailings, the Union "bug" was modified or disguised so that the source of the mailing could not be identified.

32.     Based on industry practice, Sommers & Fahrenbach and John Doe Printer knew or had reason to know that the Membership List information was wrongfully provided to them, as it was provided by a party other than the Union. Consistent with this knowledge, John Doe Printer modified or disguised its Union "bug" on subsequent mailings (as recently as June and July 2007) in an effort to hide its identity.

33.     It was a further part of the conspiracy that Ward and other Defendants would conceal the misappropriation of the Membership List by alleging that the mailings had come

from their personal address books and materials. They subsequently admitted that they had

obtained membership information, commissioned the telemarketing calls, and furnished the

telemarketing company with the member information to facilitate the calls.

34.     Certain of these admissions were made at populated membership meetings,

including those in December 2006.

35.     Ward admitted during a Senate hearing on March 8, 2007, that Team 150 had

commissioned the survey.

36.     On or about January 17, 2007, the <u>Chicago Tribune</u> reported that Defendant

Ward admitted that he commissioned this survey.

### Additional Telemarketing Activity

37.     Subsequent to the distribution of the Membership List information to third

parties, such as Research Center, Local 150 members started receiving additional

telemarketing calls from non-defendant third-parties, some referencing the Union members'

status as Local 150 members. For example, members reported receiving telemarketing calls

from third-parties who indicated that the respective members were entitled to receive certain

credit cards due to their status as Local 150 members. To Local 150's knowledge, these

telemarketing calls are the first in the Union's history.

38.     Certain members have actually had credit cards opened in their names, without

their authorization – also subsequent to the distribution of the Membership List information by

the Team 150 Defendants to third parties.

**COUNT I - V**IOLATIONS **O**F **T**HE **C**OMPUTER **F**RAUD **A**ND **A**BUSE **A**CT
**18 U.S.C. § 1030(g), § 1030 (a)(4)) A**ND **§ 1030(a)(5)(B)(I)**

39.     For its paragraph 35, the Union repeats and realleges paragraphs 1 through 38 of this Complaint as though fully set forth herein.

40.     From on or about July 26, 2006, up to and including the present time, Ward and some or all of the other Team 150 Defendants knowingly, and with intent to defraud, accessed and attempted to access the Union's computer systems without authorization or in excess of authorization, and by means of such conduct obtain property of value.

41.     As a result of their wrongful conduct, the Team 150 Defendants damaged the Union and caused it to suffer a loss in an aggregate amount exceeding $5,000, in violation of Title 18 U.S.C. §§ 1030(g), 1030 (a)(4), and 1030(a)(5)(B)(i).

**COUNT II – V**IOLATIONS **O**F **T**HE **C**OMPUTER **F**RAUD **A**ND **A**BUSE **A**CT
**18 U.S.C. § 1030(g), § 1030 (a)(5)(A)(III) A**ND **§ 1030(a)(5)(B)(I)**

42.     For its paragraph 38, the Union repeats and realleges paragraphs 1 through 38 of this Complaint as though fully set forth herein.

43.     From on or about July 26, 2006, up to and including the present time, Ward and some or all of the other Team 150 Defendants intentionally accessed and attempted to access the Union's computer system without authorization, and by means of such conduct, caused damage including, without limitation, deletion of destruction of certain computer log files or entries.

44.     As a result of their wrongful conduct, the Team 150 Defendants damaged the Union, and caused the Union to suffer a loss in an aggregate amount exceeding $5,000, in violation of Title 18 U.S.C. §§ 1030(g), 1030 (a)(5)(A)(iii) and 1030(a)(5)(B)(i).

**COUNT III - VIOLATIONS OF THE STORED WIRE AND ELECTRONIC COMMUNICATIONS And Transactional Records Act (Unauthorized Access), 18 U.S.C. §§ 2701 And 2707**

45.    For its Paragraph 41, the Union repeats and realleges paragraphs 1 through 38 of this Complaint as though fully set forth herein.

46.    Through the wrongful conduct alleged in this Complaint, some or all of the Team 150 Defendants, on information and belief, obtained unauthorized access to wire or electronic communications while they were in electronic storage in the Union's computer systems, in violation of 18 U.S.C. §§ 2701 and 2707.

**COUNT IV - VIOLATIONS OF THE STORED WIRE AND ELECTRONIC COMMUNICATIONS And Transactional Records Act (Access in Excess of Authorization), 18 U.S.C. §§ 2701 And 2707**

47.    For its paragraph 43, the Union repeats and realleges paragraphs 1 through 38 of this Complaint as though fully set forth herein.

48.    Through the wrongful conduct alleged in this Complaint, some or all of the Defendants, on information and belief, obtained access in excess of their authorization to wire or electronic communications while they were in electronic storage in the Union's computer systems, in violation of 18 U.S.C. §§ 2701 and 2707.

**COUNT V: VIOLATIONS OF ILLINOIS TRADE SECRETS LAW 765 ILCS 1065/2(B)(1) AND (2))**

49.    For its paragraph 45, the Union repeats and realleges paragraphs 1 through 38 of this Complaint as though fully set forth herein.

50.    The Team 150 Defendants have, without the consent of Local 150, intentionally, knowingly, willfully, and maliciously misappropriated Membership List information and used the confidential, secret information contained in the Membership List in the Individual

11

Defendant's businesses and campaigns for Union office, in violation of the Illinois Trade Secrets Act, ("ITSA"), 765 ILCS 1065/2(b)(1) and (2).

51.    Defendants have used Membership List information for the benefit of the Team 150 Defendants' campaign for Local 150 offices with knowledge, or reason to know, such information was confidential, secret information of Local 150 that was obtained by improper means, in violation of 765 ILCS 1065/2(b)(2).

52.    The Team 150 Defendants have unlawfully distributed Membership List information to third parties, and as a result, significantly increasing the risk of additional disclosures and violations of the information increases.

53.    Unless enjoined, the Team 150 Defendants, and those acting in concert with them, along with third parties to whom Membership List information was distributed (e.g., Research Center, Sommers & Fahrenbach, John Doe Mailing Shop, and John Doe Printer) will continue to use the confidential, secret Membership List information for their personal advantage and financial gain, including in the ongoing campaign for Union office in the upcoming election in August of 2007 and for compensation.

54.    765 ILCS 1065/3 (a), provides that the court may enjoin the "actual or threatened" misappropriation of a trade secret. 765 ILCS 1065/6 requires the court to preserve the secrecy of an alleged trade secret by reasonable means, which may include, *inter alia*, ordering any person or entity involved in the litigation not to disclose an alleged trade secret without prior court approval.   Sommers & Fahrenbach, John Doe Mailing Shop, Research Center, and John Doe Printer are necessary parties because Plaintiff cannot get the full relief

sought without their presence in this matter or without their being enjoined pursuant to 765 ILCS 1065 *et seq*.

55.     Sommers & Fahrenbach improperly provided Membership List information to John Doe Mailing Shop.

## COUNT VI: BREACH OF DUTY OF LOYALTY

56.     For its paragraph 52, the Union repeats and realleges paragraphs 1 through 38 of this Complaint as though fully set forth herein.

57.     The individual Team 150 Defendants, as officers of Local 150, breached a duty of loyalty to Local 150 by utilizing Union property for the individual Team 150 Defendants' own personal benefit to the detriment of Local 150.

58.     The individual Team 150 Defendants failed to maintain the confidentiality of the information contained in the Membership List, misappropriated the Membership List information, and allowed the unauthorized use of the Membership List information.  Each of these activities directly benefited the Team 150 Defendants to the detriment of Local 150.

59.     The individual Team 150 Defendants violated their duty loyalty to Local 150 under Labor Management Reporting and Disclosure Act (29 U.S.C. § 501) and the common law.

## COUNT VII – CONSPIRACY TO VIOLATE UNION MEMBER'S PRIVACY RIGHTS

60.     For its paragraph 56, the Union repeats and realleges paragraphs 1 through 38 of this Complaint as though fully set forth herein.

61.     From in or about July 2006, up to and including the present, Ward and some or all of the Team 150 Defendants, conspired to deprive, either directly or indirectly, the members of Local 150 of their right to privacy as provided by the laws of the United States and the States of Illinois, Indiana, and Iowa.

## COUNT VIII - CONVERSION

62.     For its paragraph 58, the Union repeats and realleges paragraphs 1 through 38 of this Complaint as though fully set forth herein.

63.     From or about July 2006, up to and including the present, the Union has had, at all times, the right to own and control the proprietary Membership List referred to in  this Amended Complaint and had an absolute and unconditional right to the immediate possession of the Membership List.

64.     As alleged in this Complaint, the Union has determined that the Defendants have wrongfully and without authorization assumed control, dominion, or ownership over the Membership List information and the Union's demand for return of the Membership List information from the Defendants has been rejected.

## COUNT IX – VIOLATION OF THE ILLINOIS FRAUD & DECEPTIVE BUSINESS PRACTICES ACT 815 ILCS 505/2

65.     For its paragraph 61, the Union repeats and realleges paragraphs 1 through 38 of this Complaint as though fully set forth herein.

66.     815 ILCS 502/2 prohibits unfair methods of competition and unfair and deceptive practices, including, without limitation, deception, fraud, false pretense, misrepresentation, or the concealment, suppression, or omission of any material fact, or any of

the practices described in Section 2 of Uniform Deceptive Trade Practices Act, with the intent that others rely upon the concealment, suppression, or omission of any material fact.

67. Defendants caused to be mailed campaign materials that each Defendant knew, or had reason to know, would mislead the recipients, mostly union members, into believing that Local 150 had given its approval, sponsorship, or authorization for the mailing.

68. Through their actions, Defendants and each of them have intentionally misrepresented or concealed the true source of the campaign materials.

69. Through their actions, Defendants and each of them have caused the Union to expend considerable sums of money and time necessary to recover the misappropriated Membership List information from every individual and entity that has acquired and or used the Membership List information from the time that the misappropriation was discovered.

WHEREFORE, Local 150 requests that the Court:

(1) Enter a preliminary injunction (i) prohibiting the Defendants from using or disclosing information contained in the Membership List; (ii) directing that the Defendants return to Local 150 all Membership List information in their possession, custody or control.

(2) Enter a final order directing the Defendants to return to Local 150 all Membership List information in their possession, custody or control, and all copies or excerpts thereof regardless of the form or nature of the medium in which such information is contained, including but not limited to the membership list.

(3) Enter a judgment in favor of Local 150 and against the Defendants, jointly and severally, in an amount to be determined in this action to compensate Local 150 for its losses proximately caused by Defendants' wrongful conduct, in an amount to be determined at trial, plus interest,

including time spent by Local 150's employees in responding to the misappropriation of information.

(4)     Enter a judgment in favor of Local 150 and against the Defendants, jointly and severally, in an amount to be determined in this action for punitive damages to deter Defendants and others from similar violations.

(5)     Grant Local 150 the costs of this action, including reasonable attorney's fees.

(6)     Grant such other and further relief as is just and appropriate.


Respectfully submitted,


INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 150, AFL-CIO


By: /s/ William J. Cook
                        One of their Attorneys


William J. Cook (#0509639)
John J. Arado (#63266)
Katherine K. Ivers (#6284902
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive
Chicago, Illinois 60606-1229
(312) 201-2000
(312) 201-2555 (facsimile)

Dale D. Pierson (#6183882)
Elizabeth Ann LaRose (#6226722)
International Union of Operating Engineers
6140 Joliet Road
Countryside, Illinois 60525
(708) 579-6663

## <u>CERTIFICATE OF SERVICE</u>

I, William J. Cook, an attorney, hereby certify that I caused a copy of the foregoing **Second Amended Complaint** to be served via the CM/ECF electronic filing system on this 3rd day of July, 2008, and thereby served upon counsel of record.


/s/      William J. Cook

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL-CIO, | ) ) | |
| | ) | No. 07 C 2779 |
| Plaintiff, | ) ) | |
| | ) | Judge Amy St. Eve |
| v. | ) ) | Magistrate Judge Nolan |
| JOSEPH P. WARD, THOMAS WARD, ROGER F. ALLEN, C. WAYNE SNIDER, Research Center, Sommers & Fahrenbach and TEAM 150 PARTY, INC., | ) ) ) | **Memorandum in Support of Motion for Preliminary Injunction** |
| Defendants. | ) | |

### INTRODUCTION

Plaintiff, International Union of Operating Engineers, Local 150, AFL-CIO (hereinafter "Union" or "Local 150") seeks preliminary injunctive relief to protect and recover the confidential, personally identifiable information – including social security numbers – of approximately 23,000 Union members. The Union's requested relief is appropriate because: (1) the Union is likely to succeed on its claims because evidence and statements of the Defendants clearly establish that they have improperly converted and used the Union's trade secret Membership List information; (2) much of the evidence involved is stored electronically and subject to immediate and irreparable spoliation; (3) Union members will be irreparably harmed if preliminary relief is not granted, as reflected by Union members who have experienced identity theft or have been placed at a higher risks of identity theft and privacy intrusions as a result of the Defendants' actions; (4) Defendants will not be harmed; and (5) the public interest will be served by the court-ordered termination of use and return of the Membership List information.

## I.   **STATEMENT OF FACTS**

### *Parties*

Plaintiff Local 150, based in Countryside, Illinois is the third-largest local (23,000 members) in the International with jurisdiction in parts of three states: Illinois, Indiana, and Iowa. *See* Declaration of James M. Sweeney ("Sweeney Decl.") at ¶ 3, attached as Exhibit A. The Union primarily represents heavy equipment operators and other employees in the construction industries. *Id.*

Defendants Joseph P. Ward ("Ward"), Roger F. Allen ("Allen"), and C. Wayne Snider ("Snider") are candidates running for Union offices in the August 2007 elections as "Team 150," and Thomas Ward ("T. Ward") is the nephew of Joseph Ward and the owner of IP address ward5120@sbcglobal.com and a supporter of Team 150. *Id.* at ¶¶10 and 12.  Ward is the elected Treasurer of Local 150 and has held that position since 1986.[1] *Id.* at ¶ 9.  Team 150 Party, Inc. is an Illinois corporation established, in part, to support the campaigns of Ward, Snider, and Allen for Union offices. *Id.* at ¶ 9. Research Center is a Florida-based telemarketing firm that provided the Team 150 candidates with telemarketing and telephone survey services. *Id.* at ¶ 15. Sommers & Fahrenbach is a Chicago-based, Illinois corporation that provided Team 150 candidates with printing and mailing services. *Id.* at ¶ 17.

### *Local 150's Secret and Confidential Membership List*

Local 150 maintains an electronic database containing Local 150 members' personally identifiable information, including, names, addresses, telephone numbers, and social security numbers (the "Membership List"). Sweeney Decl. at ¶ 5.  Local 150 members provided the information contained in the Membership List to the Union in connection with their registration

---

[1]  But on January 10, 2007, William E. Dugan ("Dugan") , Local 150 President and Business Manager, suspended Ward from his union duties due to the repeated violations of Union policies.

as members. *Id.* at ¶ 4. The primary purpose of the Membership List is to assist the Union with contacting members concerning job opportunities. *Id.* at ¶¶ 4 and 5. Other uses for the Membership List include assistance with dues collections and other communications. *Id.* at ¶ 5. Members' social security numbers of are never released. *Id.* The Membership List Information contains information not known to the public or to the members of Local 150 generally. *Id.* at ¶ 6. Considerable work, time, and expense was involved in the creation of the Membership List and is continuously involved in maintaining its confidentiality. *Id.* at ¶¶ 6 and 7. Significantly, like most databases, the Membership List contains numerous unique errors and incorrect entries. *Id.* at ¶ 7.

### Computer Security

Local 150 exercises reasonable security controls over the Membership List information. Local 150's computer systems, network, and database that house the Membership List information are password-protected. Sweeney Decl. at ¶ 6. Access to the Union's computer networks is also physically restricted. *Id.* The computer file-servers that store the database are located in a secure server room at the Union's headquarters. *Id.* The only persons with physical access to the server room are Union IT department employees, the office manager, and maintenance staff. *Id.* Local 150 technicians continually perform security monitoring and audits via the use of computer network access logs. *Id.* at ¶ 7.

### Authorized/Unauthorized Access

Local 150 did not authorize a telephone survey or any other disclosure of Membership List information. Sweeney Decl. at ¶¶ 23 and 24. All access to the Membership List information is strictly limited to authorized Local 150 personnel. *Id.* at ¶ 6. Only employees of the Union's accounting department and the Union's dispatchers are authorized to access the Membership List. *Id.* at ¶ 6. Union accounting department employees access the Membership List to track dues payments. *Id.* at ¶ 5. Union dispatchers access the information in order to provide Local 150 members with job information. *Id.* at ¶¶ 4 and 5.

While the Membership List information is unique and trade secret protected, a well known procedure exists for candidates for Union office to contact Union members. *Id.* at ¶¶ 25 and 26. During a campaign for Union office, candidates have the right to request that Local 150 facilitate campaign mailings to individuals on the Membership List. *Id.* at ¶ 26. However, at no time did Defendants or anyone on their behalf request Local 150 to facilitate campaign mailings using Membership List information. *Id.* at ¶ 26. Neither Local 150 nor its agents have provided any Membership List information to any of the Defendants or anyone acting on their behalf under the Union's policies or otherwise. *Id.* at ¶ 27. Under no circumstance would the Union have provided the unique Membership List information (containing the social security numbers and database entry errors) to the Team 150 candidates unless required by federal law. *Id.*

On December 19, 2006 and January 8, 2007, James M. Sweeney, Vice-President of the Union, demanded that Team 150 return the Membership List and his request was rejected. *Id.* at ¶ 24.

### *Unique Characteristics and Errors on the Misappropriated Membership List Information Demonstrate the Team 150 Is Using a Copy of the Stolen List*

The Team 150 Defendants have utilized the unique Membership List information to unlawfully distribute self-serving campaign literature to the Union's members. *See* Sweeney Decl. at ¶¶ 15 – 25. To accomplish this, the Team 150 Defendants shared the Membership List information with third-parties, who handled conducted telemarketing survey/promotion for Team 150 (telemarketing company known as Research Center) and the printing/mailing of Team 150 promotional pieces (Sommers & Fahrenbach). *Id.* at ¶¶ 15 – 17. Several of the Defendants have admitted that the Membership List information was provided by the Team 150 to the "Research Center" to conduct an unprecedented survey of Union Members. *Id.* at ¶¶ 21 – 24.

In November 2006, Local 150 members reported that they received telephone calls originating from Florida-based Research Center. *Id.* at ¶ 15. During the telephone survey, members were questioned about Local 150, wages, fringe benefits, as well as their feelings about Dugan and Ward, and how they would vote in the August 2007 election. *Id.* at ¶ 16. Several

members received these calls via telephone numbers that were only disclosed to Local 150 for inclusion on the Membership List. *Id.* Attempts to redial the incoming Florida telephone numbers resulted in a "disconnected" message. *Id.* at ¶ 15. Certain members who received calls were on Indiana State "Do Not Call" lists. *Id.* at ¶ 16. As noted above, these calls from the Team 150 telemarketer– sometimes using unique Membership List telephone numbers provided by the Union members to the Union – clearly reflect that the Defendants were utilizing the protected Membership List and not using telephone numbers accumulated over time from business agents working with Team 150. Contrast *id.* at ¶ 16 with ¶ 21.

Similarly, the unauthorized mailers from the Team 150 candidates to uniquely incorrect addresses on the Membership List reflect that Team 150 was using the protected Membership List. For example, Bob Reiter of the Union's Legal Department received a Ward campaign mailer at the incorrect address listed on his initial union registration. *Id.* at ¶ 18.

### *Investigation*

At the time Union members began receiving the telemarketing and other communications, in November 2006, Local 150 assembled an internal investigation team and launched an investigation to determine how the Membership List was compromised and the extent of any unauthorized access. Sweeney Decl. at ¶¶ 14 and 15. Local 150 also immediately contacted and began working with law enforcement. *Id.* at ¶ 14. Sometime before the end of November 2006, the internal investigation team contacted the FBI's Internet Crime Complaint Center and filed a complaint. *Id.* On January 8, 2007, FBI agents interviewed six Union members concerning the unauthorized telephone survey. *Id.* On March 16, 2007, the Local 150 investigation team met with members of the U.S. Secret Service Cyber Crime Unit in Chicago to discuss whether an additional investigation could be conducted by the Secret Service. *Id.* The status of the request is also pending. *Id.*

In August of 2006, the Union's IT department began seeing attempts to hack into Local 150's server in Plainfield, Illinois, which is connected to the Union's main server based in

Countryside, Illinois. *Id.* at ¶ 11. An investigation conducted by the IT Department determined that these attempts were unusual because many of them appeared to originate from individuals that have been identified as Ward supporters, especially ward5120@sbcglobal.net. *Id.* On Monday night, August 14, 2006, someone using the ward5120@sbcglobal.net email address attempted hack into the Union's computers six times; late on Sunday afternoon, August 20, someone twice used the ward5120@sbcglobal.net email address in an attempt to hack into the Union's computers; then on Sunday, August 27, 2006, the ward5120@sbcglobal.net email address was used seven times in an attempt to hack into the Union's computers. *Id.*

Joe Ward has repeatedly and publicly denied any knowledge or contention with the email account, ward5120@sbcglobal.com. *Id.* at ¶ 12. Nevertheless, on March 30, 2007, the Union obtained a court order against SBC Internet Services in the Circuit Court of Cook County for the production of the identification of the owner of email address ward5120@sbcglobal.com and determined that ward5120@sbcglobal.com is registered to Thomas R. Ward, Joe Ward's nephew and a known supporter of his Team 150 and his uncle's campaign. *Id.* Thomas Ward also lives a half mile from his uncle's residence in Shorewood, Illinois. *Id.*

A further attempt to hack into the Union's computer network occurred on October 29, 2006 at 11:54 p.m. *Id.* at ¶ 13. On this occasion the hacker apparently succeeded in breaking into the Union's main server in Countryside, Illinois, but had covered their tracks on the computer systems audit records. *Id.* As a result, the Union and a forensic examiner hired by the Union have not yet been able to determine whether, and to what extent, this hack was successful or what if anything was taken or copied. *Id.*

### Team 150 Candidate Admissions

Team 150 Candidates have admitted that they used and disseminated Union Membership List information and initiated the unauthorized telephone surveys. On December 14, 2006, at a union meeting Rockford, Illinois, Defendant Allen admitted that the Ward campaign was responsible for the telephone solicitation. *See* Sweeney Decl. at ¶ 21. Snider, Ward's running mate, and candidate for Union Financial Secretary, made the same admission on the same day at

a District 7 union meeting that took place in Merrillville, Indiana. *Id.* at ¶ 22. On December 19, 2006, the Union's Vice President, James Sweeny, asked Ward if the survey was being conducted by his campaign to which Ward responded, "yes." *Id.* at ¶ 23.

**II.**  **LOCAL 150 IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF TO STOP THE TEAM 150 DEFENDANTS FROM DISTRIBUTING, COPYING, OR USING THE MEMBERSHIP LIST INFORMATION IN ANY WAY AND TO RETURN ALL FULL OR PARTIAL COPIES OF THE INFORMATION**

It is well-settled that preliminary injunctive relief is an appropriate remedy in cases involving misappropriation of confidential information. *See* § 765 ILCS 1065/3 (actual or threatened misappropriation may be enjoined, and affirmative acts to protect a trade secret may be compelled by a court order); *Am. Family Mut. Ins. Co. v. Roth*, No. 06-3412, 2007 U.S. App. LEXIS 10783, at *9 (7th Cir. May 7, 2007); *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700-01 (N.D. Ill. 2004) (preliminary injunction ordered where defendants used information that shared a number of characteristics with the Plaintiff's confidential information, to which Defendants had access). Injunctive relief is also available under the Computer Fraud and Abuse Act (18 U.S.C. § 1030) and the Stored Wire and Electronic Communications and Transactional Records Act (18 U.S.C. §§ 2701 and 2707) ("Stored Communications Act"). *See YourNetDating, LLC v. Mitchell*, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) (granting a temporary restraining order for unauthorized access in violation of statute).

A preliminary injunction is appropriate when the plaintiff shows: 1) a likelihood of success on the merits, 2) the lack of an adequate remedy at law, and 3) irreparable harm in the absence preliminary injunctive relief. *See, e.g., YourNetDating, LLC v. Mitchell*, 88 F. Supp. 2d at 871. Once that burden is met, the Court considers the potential for harm to the non-movant if the preliminary injunction is granted. *Id.* The Court also considers whether the preliminary injunction is in the best interests of the public. *Id.*

1794501-2

7

If a court determines that the plaintiff has a "greater than negligible chance of winning," the court should turn to a "sliding scale" analysis and balance the likelihood of success and the potential harms caused by granting or not granting the motion for preliminary injunction. *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 803-04 (7th Cir. 2002); *Electro-Motive Diesel, Inc. v. Wi-Tronix, LLC*, No. 05 C 5837, 2006 U.S. Dist. LEXIS 37260 (N. D. Ill. June 7, 2006). To warrant preliminary relief, Local 150 merely needs to show some likelihood of succeeding. *See Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992); *see also Noddings Investment Group, Inc. v. Kelley*, No. 93 C 1458, 1994 U.S. Dist. Lexis 3246 at *3 (N.D. Ill. Mar. 18, 1994) ("the plaintiff must show that he has a better than negligible likelihood of success on the merits . . . .") (citing *Ping v. National Educ. Ass'n*, 870 F.2d 1369, 1371 (7th Cir. 1989)). But the more likely it is that Local 150 will prevail, "the less the balance of irreparable harm needs to weigh towards its side." *Abbott Labs*, 971 F.2d at 12.

**A.      There Is A Strong Likelihood That Local 150 Will Succeed On The Merits**

The Team 150 Defendants' admissions, on their face, establish a likelihood of success on the merits. Team 150 members admitted during Union meetings that Team 150 commissioned the telephone survey. *See supra* at p. 6-7. It is undisputed that the Union did not provide Ward the requisite personal information for making the calls or for mailing the mailers.

Local 150 will ultimately succeed on its claims against Defendants. First, Local 150 will likely succeed on its claim for Defendants' unauthorized access in violation of the Computer Fraud and Abuse Act that provides a cause of action against anyone who:

> [I]ntentionally accesses a protected computer without authorization, and as a result of such conduct, ... caused (or, in the case of an attempted offense, would, if completed, have caused) ... loss to 1 or more persons during any 1-year period ... aggregating at least $ 5,000 in value.

18 U.S.C. §§ 1030(a)(5)(A)(iii), (B)(i).  Local 150 will also succeed in its claims for the Team 150 Defendants' violations of the Stored Communications Act, which prohibits anyone without authorization or in excess of authorization from obtaining access to stored wire or electronic communications.  18 U.S.C. §§ 2701, 2707.

The Team 150 Defendants intentionally accessed and attempted to access Local 150's computer system without proper authorization and obtained valuable Membership List information, causing Local 150 damage in excess of $5,000.  *See* 18 U.S.C. §§ 1030(a)(5)(A)(iii), (B)(i).  *YourNetDating, LLC v. Mitchell*, 88 F. Supp. 2d at 871 (expedited injunctive relief granted for unauthorized access); *America Online v. LCGM, Inc.*, 46 F. Supp. 2d 444, 450-51 (E.D. Va. 1998) (unauthorized access in violation of statute warrants injunction). Local 150's evidence shows attempts to access Local 150's main, secure computer server through use of an email address with which the Team 150 Defendants have proven to be associated.  *See supra* at p. 6.  After these acts by Defendants, Local 150 members for the first time began receiving the mailings, telemarketing calls, and other unauthorized communications. Defendants admit that they commissioned the use of members' non-public personal contact information.  *See supra* at pp. 6-7.

The member information used for Defendants' commissioned communications is unique to the Membership List information contained on Local 150's computer databases.  For example, on January 22, 2007, Bob Reiter of the Union's Legal Department received a Ward campaign mailer at the incorrect address listed on his initial union employment records and reported, inaccurately, on the union's master membership list.  *See supra* at p. 5.  Ward had to have been using the proprietary membership list for this mailing to have replicated this extremely unique

error. These facts, with Defendants' admissions, show that Defendants have violated of the Computer Fraud and Abuse Act and the Stored Communications Act.

Next, Local 150 is likely to succeed on its claims for Defendants' violations of the Illinois Trade Secrets Act ("ITSA"). For Local 150 to show a better than negligible chance of succeeding on its ITSA trade secret misappropriation claim, Local 150 must show that: (1) there is a trade secret; (2) the trade secret was misappropriated by Defendants; and (3) Defendants used the trade secret for business purposes. *See* 765 ILCS 1065/2; *Qsrsoft, Inc. v. Rest. Tech., Inc.*, No. 06 C 2734, 2006 U.S. Dist. LEXIS 76120, 15-16 (N.D. Ill. Oct. 19, 2006) (citing *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992)). Under the ITSA, trade secret means:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers that: (1) is sufficiently secret to derive economic value, actual or potential, from not generally being known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."

765 ILCS 1065/2(d). Local 150's Membership List is the type of trade secret specifically protected by the ITSA. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995) (affirming preliminary injunction for threatened misappropriation of a client list). The Local 150 Membership List is valuable because it is not generally known. Local 150 has gone to great lengths and expended vast resources to protect the confidentiality of its Membership List through password protection, need-to-know access, physical and technical security, and enforcement of policies for obtaining select information for authorized mailings. These measures are reasonable under the circumstances to protect the Membership List's confidentiality, and therefore it is a protectable trade secret. *See Qsrsoft, Inc.*, 2006 U.S. Dist. LEXIS 76120, at 25-26 (ordering preliminary injunction based on plaintiff's reasonable steps to maintain confidentiality).

The ITSA defines "misappropriation" as:

(1) [A]cquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of a person without express or implied consent by another person who:
(A) used improper means to acquire knowledge of the trade secret; or
(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
(I) derived from or through a person who utilized improper means to acquire it;
(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
(C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

765 ILCS 1065/2(b). The Union is likely to succeed on its misappropriation claim because its logs show that usernames admittedly affiliated with the Defendants accessed or attempted to access the Union's secure computer system. *See Qsrsoft, Inc.*, 2006 U.S. Dist. LEXIS 76120, at 27-28 (finding that such logs were evidence of likelihood of succeeding on misappropriation claim); *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 696 (N.D. Ill. 2004) (same). As discussed above, there are unique similarities between the Membership List and the contact information used by Defendants, including errors within addresses, out-of-date addresses, spouses' contact information, and other unique similarities. These similarities would not occur in an independently-created list, but would only occur through misappropriation of the information. *See Qsrsoft, Inc.*, 2006 U.S. Dist. LEXIS 76120, at 28-29 (finding striking similarities to be evidence of likelihood of succeeding on misappropriation claim); *Computer Assocs. Int'l*, 333 F. Supp. 2d at 696-97 (same).

Local 150's breach of loyalty claim is also likely to succeed. It is a fundamental principle of agency law that officers and directors owe fiduciary duties of loyalty to their principals not to: (1) actively exploit their positions within the corporation for their own personal

benefits; or (2) hinder the ability of the corporation to conduct the business for which it was developed. *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003). By misappropriating, using, and disseminating the Union's Membership List information and using it to their personal benefit and to the detriment of the Union, the individual Team 150 Defendants breached their duties of loyalty as officers of the Union. *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 877 (N.D. Ill. 2001) (issuing a preliminary injunction for breach of duty of loyalty through copying and use of company information for personal gain). Thus, the Union is likely to succeed on this claim.

Finally, Local 150 is likely to succeed on its claims for conversion, which requires a showing that: 1) it has a right to the property; 2) it has an absolute and unconditional right to the immediate possession of the property; 3) it made a demand for possession; and 4) one or more of the Defendants wrongfully and without authorization assumed control, dominion, or ownership over the property. *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 877 (N.D. Ill. 2001) (finding that the defendant converted plaintiff's proprietary, confidential information). Local 150 is the lawful owner of the Membership List information and is entitled to possession of such information. Defendants have rejected Local 150's demand for the return of any and all Membership List information in the possession of any of the Defendants. Defendants' continued possession of the Membership List information constitutes exercise of control over property inconsistent with Local 150's right to possession thereof, and therefore constitutes conversion by Defendants. *See RKI, Inc. v. Grimes*, 177 F. Supp. 2d at 877 (N.D. Ill. 2001).

### B. Local 150 Will Be Irreparably Harmed If The Defendants Are Not Enjoined From Using The Membership List Information And Ordered to Return All Copies Of The Information

Local 150 will suffer irreparable harm, if this Court does not enjoin defendants and order the return of the Membership List information. There is a rebuttable presumption of irreparable harm to a plaintiff in cases of trade secret misappropriation. *Qsrsoft, Inc.*, 2006 U.S. Dist. LEXIS

76120, at 32 (citing *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 620 (7th Cir. 1982)); *Computer Assocs. Int'l*, 333 F. Supp. 2d at 701. A defendant can only rebut this presumption by demonstrating that the plaintiff will not suffer any harm if the injunction is not granted. *Qsrsoft, Inc.*, 2006 U.S. Dist. LEXIS 76120, at 32 Defendants have misappropriated, used, and disseminated Local 150's valuable Membership List information, threatening its confidentiality – and therefore value – of its proprietary Membership List information. There is no substitute for the Membership List, because it contains unique information that the members have entrusted to Local 150. The defendants' possession admittedly does not deprive Local 150 of the use of the list, but instead deprives Local 150 of and depletes the value of the list. Defendants could have obtained access to use the Membership List information through the proper procedures, but, instead, opted to misappropriate it for their own personal gain to the detriment of the Union. Even if Local 150 succeeds on its trade secret misappropriation and other claims, assessing the monetary value of the Membership List would be nearly impossible.

If Defendants are allowed to continue to use and disseminate the Membership List information, Local 150 will lose the value of its confidential, proprietary information, and would risk losing members, damage to its reputation, harm to its goodwill. The loss of goodwill and other non-monetary losses are virtually impossible to calculate. *See Qsrsoft, Inc.*, 2006 U.S. Dist. LEXIS 76120, at 32-33 (citing *Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (stating that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill"); *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 53 (7th Cir. 1980) (noting that damage to servicing clients efficiently constitutes irreparable harm)).

Union members did not expect to be subjected to unwanted telemarketing calls, credit card offers, telephone calls in violation of state "Do Not Call" Lists, or credit scams. These events have irreparably harmed and diminished Local 150's goodwill and its ability to serve its members. *See YourNetDating, LLC v. Mitchell*, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) (damage to plaintiff's goodwill because defendants subjected its users to illicit or harassing material was irreparable harm sufficient for expedited injunctive relief). Accordingly, no adequate remedy at law exists.

### C. The Harm To Local 150 Significantly Outweighs The Harm To The Defendants

Local 150 needs only demonstrate a likelihood of success that it will ultimately prevail on the merits, however, the more likely that it is that Local 150 will prevail, "the less the balance of irreparable harm needs to towards its side." *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). Local 150's case is strong, and the harm it is suffering is significant. The Defendants' conduct has called into question Local 150's ability to protect its members' from violations of their right to privacy by having credit cards opened in their names and various other violations.

In contrast, Defendants will not suffer any harm if the Court enjoins the use of the misappropriated Membership List information. Defendants would be merely prevented from using, selling, or distributing confidential, personal information to which they have no ownership rights. Moreover, Defendants remain entitled to use established procedures for membership communications. Thus, any potential harm to the defendants is *de minimis*. Local 150, however, faces undisputed irreparable harm. *See Qsrsoft, Inc.*, 2006 U.S. Dist. LEXIS 76120, at 33; *Computer Assocs. Int'l*, 333 F. Supp. 2d at 700-01. Accordingly, the balance of the harms greatly weighs in favor of the Union.

### D. The Public Interest Favors Preliminary Injunctive Relief

A preliminary injunction here will serve the public interest because members will have their privacy rights and expectations restored by enjoining further misconduct. *See YourNetDating, LLC v. Mitchell*, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) (finding that the public interest favored a preliminary injunction because those who wanted plaintiff's services would no longer be subjected to obscene content because of defendant's misconduct). Moreover, the public is unlikely to suffer any harm if the defendants are prevented from using, distributing, or selling the Membership List information. In addition, the public will benefit even further if defendants are ordered to provide forensic testing on their computer systems to determine how defendants used the information. Enjoining the Defendants from using and disseminating the Membership List information benefits the public overall by preventing personal, confidential information of more than 22,000 people from being circulated to the public.

### III. CONCLUSION

For the reasons set forth in this Memorandum In Support of Plaintiff's Motion for Preliminary Injunction and those set forth in the Motion for Preliminary Injunction, this Court should grant Plaintiff the injunctive relief it seeks.

Respectfully submitted,

Local 150, International Union of Operating Engineers, AFL-CIO,

By: ___/John S. Letchinger/_____

John S. Letchinger (#6207361)
William J. Cook (#0509639)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive
Suite 2900
Chicago, IL 60606-1229
(312) 201-2000

1794501-2                                              15

## CERTIFICATE OF SERVICE

     I, John S. Letchinger, an attorney, declare under penalty of perjury that a copy of the Memorandum in Support of Plaintiff's Motion for Preliminary Injunction has been served on counsel of record:

**Sommers and Farenbach**

**Barry Arnold Erlich**
Richmond Breslin LLP
233 South Wacker Drive
Sears Tower # 5775
Chicago, Illinois 60606
Email: berlich@rb-llp.com

who is an ECF "Filing Users," consistent with the terms of this Court's General Order on Electronic Case Filing and the Local Rules of the Northern District of Illinois, on July 6, 2007.

     Joseph P. Ward
     20923 South River Road
     Shorewood, Illinois 60431

     Thomas Ward
     712 Cambridge Lane
     Shorewood, Illinois 60431

     Roger F. Allen
     3915 Rockview Road
     Rockford, Illinois 61109

     C. Wayne Snider
     907 Springfield Drive
     Hobart, Indiana 46342

     Team 150 Party, Inc.
     822 Infantry Drive
     Joliet, Illinois 60435

were served via Federal Express Saturday delivery.

                       /John S. Letchinger /
                       John S. Letchinger

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL-CIO, ) ) | |
| ) | No. 07 C 2779 |
| Plaintiffs, ) | |
| ) | Judge Amy St. Eve |
| v. ) | |
| ) | Magistrate Judge Nolan |
| JOSEPH P. WARD, THOMAS WARD, ROGER F. ) ALLEN, C. WAYNE SNIDER, Research Center, ) Sommers & Farenbach and TEAM 150 PARTY, INC., ) | **Certification of James M. Sweeney** |
| ) | |
| Defendants. ) ) | |

## CERTIFICATION OF JAMES M. SWEENEY

I, James M. Sweeney, state and certify pursuant to 28 U.S.C. § 1746 as follows:

1.      My name is James M. Sweeney.  I am the elected Vice-President of Local 150 of the International Union of Operating Engineers, AFL-CIO ("Local 150" or "Union").  I have personal knowledge of the facts stated herein and could testify to them if called upon to do so.

2.      One of my responsibilities as Vice-President includes serving as Chairman of the Board of Directors of the Midwest Operating Engineers Information Technology Service Corp. (the "Board").  This is the unit that provides information technology ("IT") services for Local 150 and other related entities.  As such, I serve an oversight role over the activities of the Board and the IT department personnel.

3.      Local 150 represents over 23,000 construction workers and other employees in various industries, most of whom operate heavy equipment.  The Union's geographic jurisdiction covers northwest Indiana, northern Illinois, and eastern Iowa.  This territory is divided into eight

different Districts, and each District has its own Union Hall. The Union's headquarters in Countryside, Illinois, also serves as its District 1 Hall.

4.      Pursuant to collective bargaining agreements with various employers and employer associations, the Union administers an exclusive hiring hall out of each District office. In general, members call the Union's dispatch office to register themselves as "out of work." When an employer is in need of an operating engineer, it requests a person with specified skills. Persons having those skills are then "dispatched" to the employer on a first-in, first-out basis.

5.      In connection with registration, members of Local 150 provide the Union with personally identifiable information, including, names, addresses, telephone numbers, and social security numbers. The primary purpose of the Membership List is to assist the Union with contacting members concerning job opportunities. Other uses for the Membership List include assistance with dues collections and other communications. Members' social security numbers are never released.

6.      This Membership List information contains information not generally known to the public or to the members of Local 150. The Union exercises reasonable security controls over access to the Membership List. The computer systems, network, and database that house the Membership List information are password-protected. Access to the Union's computer networks is also physically restricted. The computer file-servers that store the database are located in a secure server room at the Union's headquarters. The only persons with physical access to the server room are Union IT department employees, the office manager, and maintenance staff.

7.      Only employees of the Union's accounting department and the Union's dispatchers are authorized to access the Membership List. Union accounting department employees access the Membership List to track dues payments. Union dispatchers access the

information in order to provide Local 150 members with job information.  Local 150 technicians continually perform security monitoring and audits via the use of computer network access logs. Considerable work, time, and expense was involved in the creation of the Membership List, however like most databases, the Membership List contains numerous errors and incorrect entries that make it unique.

8.      Local 150 conducts membership meetings in each District in the months of February, March, April, May, September, October, November, and December.  The Union conducts General Membership meetings in January and July; no membership meetings at all are conducted in June or August.  The membership meetings for Districts 3, 4, 7, and 8 are conducted on the second Thursday of those months in which District meetings are held. Members of Districts 2, 5, and 6 meet on the third Thursday of the month.  The members in District 1 meet on the fourth Thursday of the month.

9.      There are five "Constitutional Officers," elected by the Membership of Local 150. President-Business Manager, currently William E. Dugan; myself as Vice-President; Recording-Corresponding Secretary, currently Steven M. Cisco; Financial Secretary, currently David A. Fagan; and Treasurer Joseph P. Ward.  It is customary for one of these officers to preside over the District Union meetings because most of these meetings are conducted simultaneously.

10.      I am running for re-election as Local 150 Vice-President, along with Bill Dugan, Steve Cisco, and Dave Fagan on a slate of candidates we call the "United Engineers Party."  At the General Membership meeting conducted July 28, 2006, Treasurer Joseph P. Ward announced that he was running against William E. Dugan for the position of President-Business Manager in the Union election scheduled to be conducted in August 2007.  Around that same time, Roger F. Allen ("Allen"), and C. Wayne Snider ("Snider") also announced their candidacies for Union offices as running mates of Ward.  Team 150 Party, Inc. is an Illinois corporation established, in

3

part, to support the campaigns of Ward, Snider, and Allen. Ward and his running mates call themselves "Team 150."

11.     In August of 2006, the Union's IT department began seeing attempts to hack into Local 150's server in Plainfield, which is connected to the Union's main server based in Countryside, Illinois. An investigation conducted by the IT Department determined that these attempts were unusual because many of them appeared to originate from individuals that have been identified as Ward supporters, especially ward5120@sbcglobal.net. On Monday night, August 14, 2006, someone using the ward5120@sbcglobal.net email address attempted to hack into the Union's computers six times; late on Sunday afternoon, August 20, someone twice used the ward5120@sbcglobal.net email address in an attempt to hack into the Union's computers; then on Sunday, August 27, 2006, the ward5120@sbcglobal.net email address was used seven times in an attempt to hack into the Union's computers.

12.     Joe Ward has repeatedly and publicly denied any knowledge or connection with the email account, ward5120@sbcglobal.com. However, on March 30, 2007, the Union obtained a court order against SBC Internet Services in the Circuit Court of Cook County for the production of the identification of the owner of email address ward5120@sbcglobal.com and determined that ward5120@sbcglobal.com is registered to Thomas R. Ward, Joe Ward's nephew and a known supporter of his Team 150 and his uncle's campaign. Thomas Ward also lives a half mile from his uncle's residence in Shorewood, Illinois.

13.     A further attempt to hack into the Union's computer network occurred on October 29, 2006 at 11:54 p.m. On this occasion the hackers apparently succeeded in breaking into the Union's main server in Countryside, Illinois, but had covered their tracks on the computer systems audit records. As a result, the Union and a forensic examiner hired by the Union have

not yet been able to determine whether, and to what extent, this hack was successful or what if anything was taken or copied.

14.     The attempts to hack into the Union's computers have been reported to both the Federal Bureau of Investigation and the United States Secret Service. In November 2006, the internal investigation team contacted the FBI's Internet Crime Complaint Center and filed a complaint. *See* Complaint ID:10611271655077792 attached as Exhibit B. On January 8, 2007, FBI agents interviewed six Union members concerning the unauthorized telephone survey. The status of the FBI complaint is currently pending. On March 16, 2007, the Local 150 investigation team met with members of the U.S. Secret Service Cyber Crime Unit in Chicago to discuss whether an additional investigation could be conducted by the Secret Service. The status of the request is also pending.

15.     Approximately a month after the computer intrusion, in late November, 2006, the Union's offices began receiving complaints from Local 150 members about a telephone survey conducted on behalf of Joe Ward's election campaign. In general, the members reported that they received calls identified as originating in Florida. Immediate attempts to return calls to the displayed phone number got a "disconnected" message. Our investigation of the telephone calls revealed that Research Center, a Florida-based telemarketing firm, was providing the Team 150 Party with telemarketing and telephone survey services.

16.     The members reported variously that the callers represented that they were calling on behalf of Local 150 and then questioned the members about the Union generally, the wages and fringe benefits they earned, as well as how they would vote in the forthcoming election. During the calls, telemarketers told the members about their support for Joe Ward, a candidate for president of Local 150, and promoted the election of Ward for Union president. Several members received calls to phone numbers that they had disclosed only to the Local 150 dispatch

offices and were uniquely contained on the Membership List. Several of the union members who were called were on the Indiana "do-not-call" list.

17. In addition to the telephone survey calls, Ward's group also used the proprietary Membership List to conduct massive, illegal mailings to Union members. Sommers & Farenbach is a Chicago-based, Illinois corporation that provided Team 150 candidates with printing and mailing services. On January 20, 2007, a Ward mailing called "100% pure political mud" was sent to members. Again, anomalies present in the Membership List were picked up in these Ward mailings – clearly indicating that the Membership List was again being improperly used by the Ward group to contact Union members.

18. For example, on January 22, 2007, Bob Reiter of the Union's Legal Department received a Ward campaign mailer at the incorrect address listed on his initial union employment records and reported, inaccurately, on the Union's master membership list.

19. Ward had to have been using the proprietary membership list for the mailing sent to Bob Reiter to have replicated this extremely unique error.

20. On December 14, 2006, I presided over the District 4 Union meeting in Rockford, Illinois. There a member asked a question from the floor about the origins of telemarketer survey calls he received two weeks earlier. I tried to assure him and the rest of the members assembled that Local 150 took its members' privacy rights seriously, that the Union had not disclosed their telephone numbers to any third parties, and that neither the Union nor the United Engineers Party were responsible for the calls.

21. After my comments at the District 4 meeting, Joe Ward asked to be recognized. Ward told the Membership that he and Team 150 had hired a consultant to run their election campaign, and that this consultant had recommended taking a Membership telephone survey. Ward stated that he and his running mates had furnished the telemarketers with a membership

6

list with which to conduct the survey. Ward claimed that this list was one which he and his running mates had assembled over the years in the course of their jobs as officers and agents of Local 150. Ward added that they gave no personal information to the telemarketers and that the list was never out of their sight.

22.     It is my understanding that Ward's running mate, candidate for Financial Secretary Wayne Snider, made similar comments to the members in attendance at the District 7 Union meeting in Merrillville, Indiana, that same night.

23.     I attended the Local 150 Executive Board meeting conducted December 19, 2006. At that time, I stated that a third party out of Florida was conducting a survey which was not being conducted by the Union or the United Engineers Party. I then asked Joe Ward if this telephone survey was being conducted by his campaign. Joe Ward responded, "Yes," the survey was conducted by his campaign.

24.     Due to the sensitive nature of the Membership List information and membership concerns about potential disclosure of social security numbers, telephone numbers, birth dates, and addresses, during the December 19, 2006 meeting, I demanded that Team 150 return the Membership List, but Mr. Ward refused to do so. He added that the telemarketers did not have members' social security numbers, addresses, and that the telephone numbers came from members who gave him these numbers. I then asked Ward what assurance the Union had that our members' personal information that was given to an out-of-state third party would not be sold. Joe responded, "My assurance." On January 8, 2007, I repeated my demand to Joe Ward that Team 150 return all Membership List information. Again, he refused.

25.     On January 26, 2007, I attended the regularly scheduled meeting of Local 150's General Membership in Countryside, Illinois. I was present when a member asked Recording-Corresponding Secretary Steve Cisco to explain how candidates for Union office were able to

mail campaign literature to the Membership. Mr. Cisco explained that, at the expense of the candidate, campaign materials were given to the Union. Those materials which were then taken to the Union's regular mail house, which has possession of Union membership lists, and prepares the campaign materials for mailing. He added that all the United Engineers Party mailings to date had been sent to the Membership through that process. He emphasized that at no time did the candidates actually get a Membership List. A question was then referred to Joe Ward over how his mailings got to the Membership. Ward replied, "I'm getting the list from the same place they got one." Team 150 Defendants have utilized the unique Membership List information to unlawfully distribute campaign materials to the Union's membership.

26.     While the Membership List information is unique and trade secret protected, a well known procedure exists for candidates for Union office to contact Union members. Defendants did not use this procedure. During a campaign for Union office, candidates have the right to request that Local 150 facilitate campaign mailings to members. However, at no time did defendants or anyone on their behalf request Local 150 to facilitate campaign mailings. Based on my investigation with the Union's accounting office, Ward's campaign has never submitted campaign materials to the Union, and they have not been sent through the Union's mail house.

27.     Neither Local 150 nor its agents have provided any Membership List information to any of the defendants or anyone acting on their behalf under the Union's policies or otherwise. Under no circumstance would the Union have provided the unique Membership List information (containing the social security numbers and database entry errors) to the Team 150 Candidates before July 11, 2007, which is the date federal labor law permits candidates in internal union elections to inspect membership lists.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on June _____, 2007.

_____

JAMES M. SWEENEY[1]

---

[1] James M. Sweeney has approved of the forgoing certification, however, on the date of filing this declaration his original signature was unable to be obtained.  Mr. Sweeney will, however, be present and appear in Court for the status hearing at 8:30am on the following business day, Monday, July 9, 2007.

# EXHIBIT B



# COMPLAINT REFERRAL FORM

## Complaint ID:  I0611271655077792

*The following information was provided by the victim and may be forwarded to the appropriate law enforcement or regulatory agencies.*

Date:                                    11/27/2006 16:55:07

**Victim Information**

Name:                                    Tadd  Oeder
Business Name:                           IIIFFC
Age:                                     30 - 39
Gender:                                  M
Address:                                 600 South Weber Rd.
                                         Suite 10
City:                                    Romeoville
Do you live within the city limits?:     Yes
County:                                  Dupage
State:                                   Illinois
Country:                                 United States
Zip Code/Route:                          60446
Phone number:                            8156094502
Email Address:                           toeder@iiiffc.org

Name of your local police or sheriff's office:
Romeoville Sheriff's Dept.

Is the complaint you are filing related to the Internet or an online service?      No

Do you have pertinent documents in paper form?      Yes

**Information about the Individual/Business that victimized you**

Business Name:

Name:

Gender:                    U

Address:

City:

State:                     Illinois

Country:                   United States

Zip Code/Route:

Phone number:

Email Address:             ward5120@sbcglobal.net

**Other Identifiers**

Web Site:

IP Address:                69.208.186.97

IRC Server:

Chat Room Name:

Usenet Newsgroup:

Other:

**Monetary Loss**

If you lost money from the incident you are reporting,plea se specify the total dollar amount of your loss.

0

Please indicate the means of payment (select all that apply)

- [ ] Cash
- [ ] Cashier's Check
- [ ] Check/Debit Card
- [ ] Credit Card
- [ ] Money Order
- [ ] Wire Transfer
- [ ] Other (Specify)

Did you use a third party online payment service such as PayPal,BidP ay,E scrow?  No

**Description of the Incident**

Describe in your own words how you have been victimized.

User attempted to hack into critical business systems that maintain members personal information. The value of this information is roughly $1.7 Million dollars.  Iha ve a copy of the security log file that Ican  email over,bu t need an address to email it to.

Please indicate any medium used by the individual/business in the course of the incident.
- ☐ Bulletin board
- ☐ Chat room
- ☐ Email
- ☐ Fax
- ☐ In person
- ☐ Internet messaging
- ☐ Mail
- ☐ Newsgroup
- ☐ Telephone
- ☑ Web site
- ☐ Wire
- ☑ Other

Please indicate the initial means of contact with the individual/business that victimized you.
Other

Was this initial means of contact unsolicited/uninvited?
 Yes

What was your relationship with the individual/business you are complaining about prior to the incident you are reporting?
no prior relationship

Did you conduct any research on the individual/business prior to the incident?
 No

How much time has passed since you determined you were victimized?
2 - 3 months

**Contact Information**

Are there witnesses or other victims to this crime?

Just the server security logs.

Have you reported this crime to any law enforcement or government agencies?

- ☐ Better Business Bureau
- ☐ Consumer protection agency
- ☐ Individual/business that victimized you
- ☐ Police/other law enforcement
- ☐ Private attorney

Provide the specific name of each organization, con tact name, con tact phone number, email address, da te reported, and report number (if known).

 [leftblan k]

# Exhibit C



# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL-CIO, | ) ) ) | |
| | ) | No. 07 C 2779 |
| Plaintiff, | ) ) | |
| | ) | Judge Amy St. Eve |
| v. | ) ) | Magistrate Judge Nolan |
| JOSEPH P. WARD, THOMAS WARD, ROGER F. ALLEN, C. WAYNE SNIDER, RESEARCH CENTER, SOMMERS & FAHRENBACH and TEAM 150 PARTY, INC., JOHN DOE MAILING SHOP, AND JOHN DOE PRINTER, | ) ) ) ) ) ) | **Agreed Injunction** |
| | ) | |
| Defendants. | ) ) ) ) | |

## AGREED INJUNCTION ORDER

Plaintiff, International Union of Operating Engineers, Local 150, AFL-CIO ("Local 150" or the "Union") and Joseph P. Ward, Thomas Ward, Roger F. Allen, C. Wayne Snider, and Team 150 Party, Inc. ("Team 150" or "Team 150 Defendants"), in resolution of Plaintiff Local 150's previously-filed motion for Preliminary Injunction, Docket Entry ("DE") Nos. 30-31, agree to the following injunction:

### IT IS HEREBY ORDERED THAT:

1. This agreed order for Injunction ("Order" or "Agreed Order") applies to all Defendants, including their agents, heirs, servants, successors, insurers, officers, and employees, unless otherwise specified. As litigation continues, Defendants' counsel is explicitly excluded from the provisions herein except as otherwise stated.

2. The Team 150 Defendants represent that they anonymously obtained a CD-ROM containing the names, addresses, and telephone and cellular numbers of members of the

#1809334

1

International Union of Operating Engineers, Local 150, AFL-CIO ("Membership Information"). Each of the Team 150 Defendants shall attest to the veracity of the representation in this Paragraph 2, to the extent they know.

3.  The Team 150 Defendants provided Sommers & Fahrenbach and a third-party survey company a copy of the Membership CD-ROM. For purposes of this Order, any reference to the Membership CD-ROM and any partial or full list containing Membership Information in the possession, or that has been in the possession, of Defendants shall include any and all information received by Sommers & Fahrenbach, third party survey providers, or any other unauthorized third party from the Team 150 Defendants.

4.  The Team 150 Defendants will allow the Plaintiff access to the Membership CD-ROM to confirm the contents thereon and to make a forensic copy for any further purposes.

5.  For purposes of this Order, the obligations and restrictions specified herein will not apply to Membership Information obtained by the Team 150 Defendants from independent sources that have not been alleged or identified in this Order as the source(s) of the Membership Information alleged to have been misappropriated.

6.  Defendants shall immediately and permanently cease use, sale, distribution, and disclosure of any and all information obtained from the Membership CD-ROM or any partial or full list containing Membership Information.

7.  Defendants shall produce within seven (7) days of this Order a log that identifies (a) the physical location and type of all hardcopy records containing information obtained from the Membership CD-ROM or any partial or full list containing Membership Information; and (b) any electronic device upon which any information from the Membership CD-ROM or any partial or full list containing Membership Information has been copied and/or electronically stored:

a. For purposes of this Order, electronic device shall include, but not be limited to, CD-ROM, DVD, USB devices, computer hard drives, Personal Digital Assistant, and/or mobile or cellular telephone memory; and

b. The Log shall detail the name and type of the device, and the owner who generally keeps or controls such device.

8.    Within seven (7) days of this Order, the Defendants shall deliver all full or partial lists of Membership Information obtained from the Membership CD-ROM (regardless of the form or nature of the medium in which the information is stored or kept) to their counsel:

a. Where any information identified on the Log is no longer available, the Defendants shall state the reasons for which the information is no longer available; and

b. Counsel for Defendants shall provide Plaintiff's Counsel a log of all items subject to this Paragraph 8.

9.    Defendants shall permit a forensic examination of all electronic devices identified in Paragraph 7 subject to the following terms:

a. The Parties shall agree upon a neutral expert ("Neutral Expert");

b. The Neutral Expert shall conduct the forensic examination;

c. The Neutral Expert shall limit a search of the electronic devices to key terms or items agreed upon by the Parties;

d. The results obtained from the forensic examination shall be disclosed to counsel for all Parties; and

e. The Defendants shall permit the electronic deletion of any residual electronic data determined to be obtained from the Membership CD-ROM or any partial

or full list containing Membership Information (this deletion may be completed by Defendants' forensic expert provided the party who completes the deletion provides a thorough report of the process and items so deleted).

10. Upon (a) completion of the obligations in Paragraph 8 and (b) the completion of the obligations in Paragraph 9, each of the Defendants shall affirm that they: (a) have delivered all tangible copies of the Membership CD-ROM and any partial or full list of Membership Information and the contents therein to their counsel; (b) have secured the electronic deletion of any residual electronic data from the Membership CD-ROM or any partial or full list containing Membership Information from the devices described in Paragraph 7 of this Order; and (c) no longer possess any complete or partial copies of any information obtained from the Membership CD-ROM.

11. Nothing contained in this Agreed Order shall be construed as an admission of liability. The Defendants expressly deny any liability related to the claims in the Plaintiff's Amended Complaint.

ENTERED: _11-16-07_

JUDGE: _Amy J St. E_

HON. AMY J. ST. EVE

APPROVED:

INTERNATIONAL UNION            DEFENDANTS
OF OPERATING ENGINEERS,
LOCAL 150, AFL-CIO

By: _____         By: _____

#1800334                                        Α

# Exhibit D

January 7, 2008

Mary J. Kebisek, District Director
Chicago District Office
U.S. Department of Labor, OLMS
230 S. Dearborn St., Room 774
Chicago, IL 60604

RE:   International Union of Operating Engineers, Local 150
      Union Officer Election Complaint

Dear Ms. Kebisek:

We are filing this complaint with the Department of Labor based on the failure of the
union to remedy the various violations of the LMRDA that the union allowed to occur
during the election process. The issues and allegations we raised were filed internally
with Local 150 and then with the International Union of Operating Engineers and are
enclosed here in the attached document titled "Election Protest."

We have exhausted our efforts to seek remedy with the Local Union and with the
International. On August 25, 2007, the ballots were counted on the election. On
September 21, 2007, Local 150 was served our protest (see attached proof of delivery
from the United States Post Office). Local 150 denied our protest. Finally on Nov 14,
2007, the International Union of Operating Engineers received our appeal of Local 150's
denial of our protest (attached is our letter and proof of delivery from the United States
Post Office). As of today's date neither the Local nor the International has remedied the
election violations nor have they instructed that a new election be run.

Therefore we request that the Department of Labor investigate and remedy, if possible,
the attached described election violations.

Sincerely,

Joseph P. Ward
Member in Good Standing

James J. Miller
Member in Good Standing

Roger F. Allen
Member in Good Standing

James R. Yasko
Member in Good Standing

JPW/ls

enclosure

Contact Information:

Joseph P. Ward
708-218-2179
20923 S. River Rd.
Shorewood, IL 60404

James J. Miller
708-218-2179
8360 Mendingwall Dr.
Woodridge, IL 60517

Roger F. Allen
815-985-7298
3915 Rockview Rd.
Rockford, IL 61109

James R. Yasko
815-276-8115
4620 W. Grand Ridge Rd.
Verona, IL 60479

September 17, 2007

Steven M. Cisco, Recording-Corresponding Secretary
International Union of Operating Engineers Local 150
6200 Joliet Road
Countryside, IL 60525

RE:    Filing of Election Protest

Dear Mr. Cisco:

The candidates of Team 150 are protesting the results of the August 25, 2007 election according to the By-Laws of the International Union of Operating Engineers, Local 150, Article XIV – Petitions and Nominations, Election and Installation, Section 13. Election Protest and the Constitution of the International Union of Operating Engineers, Article XXIV. Subdiv. 1. Section (g).

The specific reasons for this protest are set forth in writing and are presented to you in the enclosed *Election Protest* document.

I am submitting this protest and these supporting documents on behalf of and as representative of our Team 150 candidates.

Yours truly,

Joseph P. Ward

JPW/lms

enclosure

sent via USPS Registered Mail

## ELECTION PROTEST

The following members of IUOE Local 150 hereby file an Election Protest to the 2007 election of officers pursuant to Article XIV, Section 13. The election results of August 25, 2007 must be set aside, declared null and void, and a new election must be ordered. This action is required on account of the numerous election irregularities and infractions which occurred in violation of federal labor laws governing fair elections, as well as the union's By-Laws and Constitution.

This protest alleges violations and/or violations of the Constitution of the International Union of Operating Engineers; violations and/or election violations of the By-Laws of IUOE Local 150; violations of the LMRDA (Labor-Management Reporting and Disclosure Act); violations of the members Bill of Rights under 29 USC 411; violations of election procedures set forth under 29 USC 481; violations in derogation of fiduciary responsibilities under 29 USC 501; and also violations under the Code of Federal Regulations (CFR) including but not limited to abuses of campaign safeguards. ERISA violations have also been implicated.

None of the citations of alleged violations of union and/or labor laws below are meant to be exclusive of other violations that the complained of conduct may have violated. All citations are for the purpose of including, but not limiting, the election protest to potential legal infractions identified herein.

Violations of IUOE Local 150 By-Laws include Article IX, Sections 5, 6 and 7; Article XI the Duties of Officers; and, Article XIV, the rules governing elections. Violations of the Constitution of the IUOE include Article XVI violations, among others.

### Election Violations:

1)  **Improper Election Campaign Mailing and use of Union Funds:**
    William E. Dugan on July 13, 2007, one month before the ballots were to be mailed, sent a letter on Local 150 letterhead to the entire membership informing them that their identity has probably been compromised by a security breach. He notifies the membership that it was done by Joe Ward and his campaign team and that Local 150 has filed suit in federal court against Team 150 and Joe Ward. This letter was sent out with union funds. (Exhibit A)

    Violations include: LMRDA Section 401(g). 29 USC 481; also, violation of 29 CFR 452.73 Use of Union Funds.

2.  **Improper Election Use of Benefit Plan Funds:**
    The UEP never answered our mail-outs regarding the pension and health and welfare issues we addressed in this campaign. Instead, MOE sent mail outs paid for by the funds to counter Team 150 claims of malfeasance and

waste in Pension planning and waste and inefficiency of the Pharmacy in Countryside. (Exhibit B)

*Violations include: LMRDA Section 401(g), 29 USC 481; also, possible ERISA violation -- use of benefit funds.*

3.    *Improper Election Use of Union Newsletter and Union Funds:*
Use of the Union newspaper, especially the headline in February, 2007 Union Newspaper -- Local Sues Treasurer Ward! Bill Dugan says" I never imagined that he would have done something like this -- profited personally at the expense of Local 150 and its members. "Dugan used this union paper to slander Joe.  The editor stopped printing Joe Ward's articles as of the March 2007 issue. We have all the newspapers back to August, 2006. Included here is the November, 2006 edition where he uses the paper to counter our campaign issues on the pension. The International Union's magazine in the Spring 2007 issue promoted Bill Dugan. The International Union also issued a resolution to stop access to our website and to stop the voice of the opposition.  The September, 2007 issue has no notices of the identity theft issue which they used in issues prior to the election to campaign against Team 150.

*Violations include: LMRDA Section 401(g), 29 USC 481; also, violation of 29 CFR 452.75 Union Newspaper*

4.    *Improper Election Conduct In Violation of Members Rights:*
Seven business agents and other staff were fired for political reasons (Their statements Exhibit D).

*Violations include: LMRDA Section 401(e), 29 USC 481; also, violation of 29 USC 411 Sections (a) (1) & (2) Bill of Rights*

5.    *Improper Election Conduct and Improper Use of Union Funds:*
The fired staff was replaced with 20-25 new staff for the purpose of campaigning which included hand delivering UEP campaign literature to job sites (bags left on machines or by time clocks by business agents Exhibit E).

*Violations include: LMRDA Section 401(g), 29 USC 481.*

6.    *Improper Election Campaigning and Use of Union Funds:*
Agents and other staff campaigned on work time (claimed they took personal days which new hires would not have any time available)
    a.  Told members on job sites to remember who sold you your card.
    b.  Told members that their votes would not be confidential or secret therefore intimidating a large portion of the membership not to vote

    c.  Agents Campaigning during working hours- Mike Kresge, Dist. 4 agent said, " I'm not supposed to do this but I am going to anyways," in a landfill south of Rockford.

    d.  Agents telling municipality members "if Team 150 gets in they will drop you from the Union when your contract expires."

    e.  Campaign literature in the agent's office in view while speaking to members. (Picture of Mike Kresge's office enclosed.)

    f.  Hiring 20-25 additional staff. Total Business agent's salaries have increased on the monthly expenses from $695,000 in August of 2006 to $820,000 in January of 2007. Raises take place June 1st.

*Violations include: 29 USC 411 Bill of Rights [a thru e], Violations of LMRDA Section 401(e) & (g)*

7.    *Improper Electioneering; Improper Use of Union Funds; Improper Conduct in Violation of Constitution and Article VI By-Laws Regarding Membership:* Business Agents signing up members (selling cards) up to the deadline of June 30, 2007. We believe the number of new members has increased dramatically since August of 2006. The Executive Board has been asking for a report since about last November of all new members from August 1, 2006, we were supposed to have it at our March meeting on the 29th but we were never given the report we requested.

    a)  Former rules and standards went out the window in the selling of these new cards <u>including but not limited to Advisory Board and Executive Board approval</u>. Members were reinstated unfairly and in a discriminating manner. One of our supporters, Robert Law, was expelled in February 2007 and was never reinstated although he has the funds to pay his dues. He was required to attend the Advisory Board (which was never before required of members working for the City of Chicago unless they quit their City job and needed to go on our out-of-work list), and pass three proficiency tests while others (Gary Benefield reinstated expelled member, copy enclosed) who just had to pay the agent. Our supporter never received a ballot.

    b)  Request all accounting records from August 1, 2006 through September, 2007 to compare to report we received from concerned party.

    c)  Manipulating the hiring hall lists for votes by sending new members out to jobs which was highly out of ordinary procedure. (This activity was documented as it occurred in Districts 2 and 5.)

d) Local 150 Business Agent who sold union cards to the Hazelcrest police sergeants on June 27, 2007, told these new members that they will get a ballot. When asked by one of the sergeants who the candidates are he told them that there is only one - Bill Dugan, the other guy will be in jail.

e) Agents solicited permitted members to sell them a Local 150 card, "but first let me tell you about Bill Dugan." This was reportedly done by Albert Dunker, repair shop agent.

f) All permit members inquiring about receiving their new card were told they must schedule appointments with the District 1 office rather than their home district office to get their card.

g) Agents were issued receipt books (each book contains 50 receipts) and were given stacks of tri-fold cards (membership applications) for the purpose of selling cards (see example enclosed). There are 63-65 staff members and if each sold 50 cards for the election that is 3,150 to 3,250 cards sold for votes. There was a higher than ordinary number of transfers into our local from Local 139. Transfers are not usually allowed during our work season, especially when we have members on the out-of-work list. These members were designated to various districts to hide what was going on.

h) No one can be sold a card without completing a Comet Class. Jim Sweeney is in charge of the Comet Class records and has access to change or falsify them.

i) There are reports that cards were sold after the June 30 deadline for a vote. We suspect that any current member who wanted to get a son, daughter, relative or neighbor in the local had the opportunity to do so in exchange for support and a vote for Bill Dugan. We suggest all accounting records from July 1, 2007 through the next two quarters be examined to see how many new members were sold cards but whose membership papers they will now take their time to process.

*Numerous violations include: 29 USC 411 Bill of Rights; LMRDA 29 USC 481 Election Procedures; 29 USC 501 Fiduciary Responsibility of Officers of Labor Organizations and Violations of IUOE Local 150 By-Laws Article VI, Sections 1 thru 3.*

8.  *Improper Election Conduct, Use of Funds and Use of Joint Contribution Funds:*
    Training Site staff was fired for supporting Team 150 and replacements were hired for the purpose of campaigning. Statements from Training site staff enclosed, also eyewitness account of the use of Apprenticeship resources for the purpose of campaigning -- copy machines, phones, apprenticeship classes, access to the training site, etc. The Training Site completion was accelerated so that the Grand Opening will coincide with the election. The original completion schedule was for the fall of '07. This was done at much expense to the membership because of overtime costs, etc.

    *Violations include: 29 USC 411 Bill of Rights [a thru e]; LMRDA Section 401(e) & (g)*

9.  *Improper Electioneering, Improper Use of Union Funds, Improper Conduct in Violation of Constitution and Article VI By-Laws Regarding Membership:*
    Hispanic vote -- union cards sold to illegal's who should not have received ballots.

    *Numerous violations include: 29 USC 411 Bill of Rights; LMRDA 29 USC 481 Election Procedures; 29 USC 501 Fiduciary Responsibility of Officers of Labor Organizations.*

10. *Improper Election Procedure:*
    The length of time for a ballot to be returned is inadequate because of the poor delivery record of the postal service in the Chicago area

    *Violations include: 29 CFR 452.67 Distribution of Campaign Literature*

11. *Improper Election Campaign Conduct:*
    At the January 2007 General Membership meeting members supporting the UEP were let in the side doors so that they could sit in front and by the microphone. At that meeting and at other union meetings UEP Campaign literature was on the seat of every chair in the union hall.

    *Numerous violations include 29 USC 411 Bill of Rights*

12. *Improper Election Campaign Conduct in violation of the Members Rights, Compromised Secrecy of the Ballots and the Integrity of the Election Process:*
    Stewards in the municipality sector where instructed to collect ballots. From July 2006 through the present the business agents in this sector constantly campaigned for Bill Dugan by intimidating these members that if Joe Ward is elected their sector will be thrown out of Local 150.

*Violations include: 29 USC 411 Bill of Rights; also, LMRDA 29 USC 481, Sections (e) & (g)*

13.  *Improper Election Campaign Conduct in violation of the Members Rights, Compromised Secrecy of the Ballots and the Integrity of the Election Process:*
Landscape stewards/owners/agents collected ballots from landscapers.

   *Violations include: 29 USC 411 Bill of Rights; LMRDA 29 USC 481, Sections (e) & (g); also, possible violation of 29 USC 504, Section 302 (b) (1)*

14.  *Illegal and/or Improper Election Conduct:*
The UEP took contributions or received things of value from non-union companies including Bond Brothers.

   *Violations include: 29 USC 504, Section 302.*

15.  *Improper Election Conduct and use of Union/Joint Contribution Funds:*
MOE pharmacy staff was called into a meeting headed by Jim Sweeney and Steve Cisco and was instructed to "campaign" for Bill Dugan by singing his praises and bad-mouthing Joe Ward.

   *Violations include: 29 USC 481, Section 401(g)*

16.  *Improper Election Conduct, Use of Union Funds and/or Use of Joint Contribution Funds:*
Apprenticeship classes were used to campaign for Bill Dugan.
   a.  During these classes they were told how wonderful Bill Dugan was and talked about how awful the opposition was.
   b.  Paddock gave them shirts in UEP colors and told them they were to wear them to the General Membership meeting.
   c.  Apprentices were given double credit for attending the General Membership meeting in July, 2007, and wearing their green shirts.
   d.  Proficiency requirements were changed to facilitate the apprentices passing their proficiency tests.
   e.  Newly indentured apprentices were immediately required to pay dues while serving a probation period so that they could vote. Request for revision by DOL of Apprenticeship Standards for this policy change. Prior to this election year apprentices would not become a dues paying member until completion to the probation period. Money was collected for dues without an approved revision of the Apprenticeship Standards. They were sold union cards so that they would get a ballot which contradicted set procedure.
   f.  The Apprenticeship Coordinator, Bob Paddock, took groups of apprentices out for pizza and beer at Cemeno's or Sports bars in

the Joliet area, one every two weeks since January, 2007. The charges for each party were between $700.00 and $1,000.00 on a credit card for each party. Bob Paddock claims these parties were a class on unionism; we charge that they were nothing more than Bill Dugan rallies. Who paid for these rallies?

g. A ballot signing party was held by Bob Paddock and the Apprenticeship staff.

*Violations include: LMRDA 29 USC 481, Sections (e) & (g); 29 USC 411 Bill of Rights; and possibly ERISA.*

17.  *Improper Election Conduct:*
Campaigning at Comet classes by having only UEP candidates speak to the class about Bill Dugan and the negative things about Joe Ward and then handing out UEP campaign literature in the parking lot. All new members must attend a Comet Class before their membership papers can be processed. Jim Sweeney had total control of the list of who completed the class and was ready to go. This included name, address, phone numbers and employer. It would have been easy to make contact with these individuals and sell them a card.

*Violations include: LMRDA 29 USC 481, Sections (e) & (g).*

18.  *Improper Election Campaign Conduct in violation of Members Rights, Compromised Secrecy of the Ballots and the Integrity of the Election Process, plus Illegal and Improper Electioneering:*
Ballot signing parties -- we have pictures of Jim McNally, Assistant to Bill Dugan in attendance and witnesses saw Business Agent Kevin Burke actually filling out other members ballots and then placing them in the ballot boxes.

*Violations include: 29 USC 411 Bill of Rights; also numerous LMRDA violations*

19.  *Improper Election Conduct and Use of Union Funds:*
The UEP used the copy machines at all the union offices and at the training site offices to run off UEP handouts. This was witnessed at the training site where staff was also seen carrying out UEP banners and signs. We request a report of the amount of copies run off during the period of August 2005 through July 2006 so that it can be compared to the amount of copies run off from August 2006 through August 2007 to show that these union resources were used for campaign purposes.

*Violations include: LMRDA 29 USC 481, Section 401 (g); 29 CFR 452.73*

20. *Improper Election Conduct and Use of Union Funds:*
UEP candidates used Union funds to file frivolous lawsuits against Joe Ward and Team 150 for the purpose of using them for their campaign literature.

   *Violations include: LMRDA 29 USC 481, Section 401 (g); 29 CFR 452.73*

21. *Improper Election Conduct and Use of Union Funds:*
Used the Teamster hall to phone bank.

   *Violations include: LMRDA 29 USC 481, Section 401 (g); 29 CFR 452.73*

22. *Improper Use of Union and/or Joint Contribution Funds::*
Used the membership money to showcase the New Training Site giving Bill Dugan sole credit for it. Frivolous expenditures were made regarding the Training Site Grand Opening event. It was used as a campaign rally for the UEP. Shirts in the UEP's colors were given to all staff and apprentices who were told that it was mandatory to wear the green shirts and to work the event. Water bottles with Bill Dugan's name on them were handed out at the Grand Opening. Jansco Promotional Products said that they supplied 5,000 bottles at a cost to the union of $1.18 per bottle which was $5,900.00 so that Bill Dugan can have his name promoted. Plain old water bottles without Dugan's name on them would have cost about $1,100.00 for 5,000.

   *Violations include: LMRDA 29 USC 481, Section 401 (g); 29 USC 501 Breach of Fiduciary Duty; and possibly ERISA.*

23. *Improper Use of Union and/or Joint Contribution Funds:*
Use of apprentice funds? Or union funds? To paint the crane at the Training Site UEP colors – black and green.

   *Violations include LMRDA 29 USC 481, Section 401 (g); also, 29 USC 501 Breach of Fiduciary Duty.*

24. *Improper Election Campaign Mailing and Use of Union Funds:*
The IUOE newsletter promoted Bill Dugan and the Training Site by including a special color magazine for the July 2007 issue.

   *Violations include LMRDA 29 USC 481, Section 401 (g); also, 29 CFR 452.75*

25. *Improper Election Conduct and Use of Union Funds:*
Used Local 150 money to color the Dues Buttons in the UEP campaign colors.
   *Violations include LMRDA 29 USC 481, Section 401 (g)*

26. *Improper Election Conduct and Use of Union Funds, Violations of Members Rights:*
Used dues money to try to shut down the members' opposition website by requiring login which their site violated for 5 days right before the election.

*Violations include: 29 USC 411, Bill of Rights*

27. *Improper Election Conduct and Election Mailing Procedures:*
Team 150 was forced to use the mail house the union used. At first we were told we could use any mail house as long as they would sign a confidentiality agreement with Local 150. Then as we were walking to our cars they ran out and said we could only use Dahlgren or Bond Brothers. This is a conflict because our most important mailing -- our sample ballot has still not reached some of our membership.

*Violations include 29 CFR 452.67 Distribution of Campaign Literature; also, LMRDA 29 USC 481, Section 401(e); and 29 USC 411, Bill of Rights*

28. *Improper Election Conduct:*
Election Commissioner Bob Gillengarten campaigning for Dugan on UEP website video clip.

*Violations include: LMRDA 29 USC 481, Section 401(e); and 29 USC 411, Bill of Rights*

29. *Improper Use of Union Funds and/or Union Facilities:*
What is the address of the UEP Campaign office? Joe Ward's secretary's position was eliminated by Bill Dugan. Dugan told her that he could not allow any politicking in the union office. Later he took Joe Ward's office away from him. If the union offices were used by the UEP as their campaign office then they also used the union resources -- copy machines, phones, faxes, utilities and staff members for their campaign. Where was the UEP's campaign office, none is listed on their website or any of their literature. Who is their "secretary" or office help?

*Violations include: 29 CFR 452.82 Reprisal for Exercising Right; also, violation of LMRDA 29 USC 481, Sections 401 (e) & (g)*

30. *Improper Use of Union Funds and/or Union Facilities:*
Agents constantly campaigned during work hours. Enclosed are a sampling of reports received from members. Agents drove to UEP rallies in union vehicles, we have pictures. Bill Dugan drove the Local 150 van to the District 4 hall for his Rockford rally. Photo available.

*Violations include: LMRDA 29 USC 481, Section 401 (e), also, 29 CFR 452.76 Campaigning by Union Officers.*

*WHEREFORE, FOR ALL THE REASONS SET FORTH ABOVE, TAKEN BOTH INDIVIDUALLY AND IN CONJUNCTION WITH EACH OTHER, THE ELECTION RESULTS OF AUGUST 25, 2007 MUST BE SET ASIDE AND A NEW ELECTION ORDERED. IT IS ALSO PETITIONED HEREIN THAT REMEDIAL ACTION IS REQUIRED IN ORDER TO UNDO THE PREJUDICIAL EFFECTS CREATED BY THE ABOVE DESCRIBED CONDUCT AND TO GUARANTEE A FAIR ELECTION PROCESS.*

Signed this 17th day of September, 2007

By:

*Joseph P Ward*

Joseph P. Ward

On behalf of and as representative of these Team 150 Candidates:

Joseph P. Ward -- Candidate for President-Business Manager
James J. Miller -- Candidate for Vice President
Roger F. Allen -- Candidate for Recording-Corresponding Secretary
C. Wayne Snider -- Candidate for Financial Secretary
Frank A. Studer -- Candidate for Treasurer
Craig Jorsch -- Candidate for Executive Board District 1
Donald Matteson -- Candidate for Executive Board District 2
Raymond Stevens -- Candidate for Executive Board District 3
Bradley Milliken -- Candidate for Executive Board District 4
Lance Yednock -- Candidate for Executive Board District 5
Tim Loftus -- Candidate for Executive Board District 6
Greg Allen -- Candidate for Executive Board District 7
Roger Hoffman -- Candidate for Executive Board District 8
Jerry Jorsch -- Candidate for Auditor
Jason Ness -- Candidate for Auditor
Michael Quale -- Candidate for Trustee
Thomas Dalton Jr. -- Candidate for Trustee
Stephen Mullen -- Candidate for Trustee
George Pilate -- Candidate for Conductor
Randall Rexford -- Candidate for Guard

 **UNITED STATES POSTAL SERVICE**

Track & Confirm          FAQs

# Track & Confirm

### Search Results

Label/Receipt Number: RR85 4269 530U S
Detailed Results:

- **Delivered, September 21, 2007, 6:52 am, LA GRANGE, IL 60525**
- Arrival at Pick-Up-Point, September 18, 2007, 7:36 am, LA GRANGE, IL 60525
- Arrival at Unit, September 18, 2007, 7:36 am, LA GRANGE, IL 60525
- Acceptance, September 17, 2007, 3:30 pm, JOLIET, IL 60436

### Track & Confirm

Enter Label/Receipt Number.



### Notification Options

**Track & Confirm by email**

Get current event information or updates for your item sent to you or others by email.

---

POSTAL INSPECTORS    site map    contact us    government services    jobs    **National & Premier Accounts**
Preserving the Trust              Copyright © 1999-2004 USPS. All Rights Reserved. Terms of Use  Privacy Policy



ttp://trkcnfrm1.smi.usps.com/PTSInternetWeb/InterLabelDetail.do

9/21/2007

# Exhibit E

# United States of America

## DEPARTMENT OF LABOR
## OFFICE OF LABOR-MANAGEMENT STANDARDS

### SUBPOENA DUCES TECUM

TO   International Union of Operating Engineers Local 150

6200 Joliet Road, Countryside, IL 60525

*At the instance of the*   District Director

**U.S. DEPARTMENT OF LABOR,** *you are hereby required to appear before*   Shamus McGee, Investigator

*of the* **OFFICE OF LABOR-MANAGEMENT STANDARDS, U.S. DEPARTMENT OF LABOR,** *at*

230 South Dearborn Street, Suite 774

*in the City of*   Chicago, IL

*on the*   21st   *day of*   March  , 20 08  , *at*   10:00   *o'clock*   a. m.

*of that day, in the Matter of*   an investigation by said office involving complaints filed with the

U. S. Department of Labor regarding the International Union of Operating Engineers Local 150

officer elections held on August 25, 2007.

*And you are hereby required to bring with you and produce at said time and place the following books, papers, and documents:*

See the attached two pages.

## FAIL NOT AT YOUR PERIL.

IN TESTIMONY WHEREOF, *the seal of the* U.S. DEPARTMENT
OF LABOR *is affixed hereto, and the undersigned, the* District
Director, Office of Labor-Management Standards

_____ *of said* U.S. DEPARTMENT OF LABOR,

*has hereunto set his hand at*   Chicago, IL

*this*   14th   *day of*   March  , 20 08

OLMS-13 (9/88)
GPO 937-870

**150 Attachment to March 14, 2008 Subpoena Duces Tecum – IUOE Local**

All records maintained by the International Union of Operating Engineers Local 150 (Local), 6200 Joliet Road, Countryside, Illinois 60525, pertaining to the nominations and election of officers conducted on August 25, 2007. These records are to include, but not limited to: 1) membership list(s), mailing lists and voter registers, 2) minutes of all meetings including the Local Executive Board and membership meetings pertaining to said nomination and election of officers, 3) all ballots including challenged and unused, 4) all working papers, tally sheets and other documents used in conducting said nomination and election of officers, including the reconciliation of votes cast and the results reported to the membership, 5) electronic membership records and eligibility lists as of the date of each election to include the member's full name, address, phone number, membership status/designation, employer, and start date with union, 6) all financial records pertaining to the conduct of said election, including invoices and cancelled checks or pay stubs for election expenses paid to members and vendors, 7) any and all records that exist and are used by the Local's officers to determine a member's status, and 8) all rules and regulations promulgated concerning said nominations and election of officers.

At this time, we are asking for the following documents:

1) A copy of any and all e-mail messages sent to John Hughes and/or other stewards regarding the collection of voted ballots from Tom Spaeth or any other union representatives. Note that the copy of the e-mail provided on March 12, 2008 does not appear to have been sent to Hughes.

2) A copy of any and all follow-up e-mail messages sent by Spaeth, or any other union representatives, to Hughes and/or other stewards that instruct the stewards to have the members mail their own ballots.

3) A listing, electronic if available, containing the names of all permit holders and registered apprentices who were sold membership cards during the period January 1, 2006 through December 31, 2007. The list should include each member's union identification number, mailing address, and telephone number.

4) A listing, electronic if available, containing the names of registered apprentices as of June 30, 2007. The list should include the address, phone number(s), and union identification number of all dues paying apprentices regardless of their good standing status.

5) A copy of the invoice supporting the purchase of the water bottles distributed during the 2007 grand opening of the Wilmington apprenticeship school.

6) Documentation that supports Steve Karpowicz and Rajko Jovicevic's claims that they used vacation leave sometime between August 11, 2007 and August 25, 2007.

7) Copies of general membership meeting minutes for January 2006 and July 2007.

8) For all issues of the *Local 150 Engineer* mailed between January 2006 and December 2007, provide USPS-generated documentation showing the mailing

150 Attachment to March 14, 2008 Subpoena Duces Tecum - IUOE Local

        dates and costs (for example, USPS Postage Statements that have been stamped and signed by the USPS).

9) Minutes of union meetings held during the fall of 2006 as referenced on page 94 of the "Report To The Executive Board On The Investigation Into The Protest Of The Local 150 Election 2007."

10) A listing, electronic if available, of all Local 150 members who were mailed a ballot during the August 2007 officer election. The list should include each member's address, union identification number and telephone number(s).

11) For the July 13, 2007 privacy protection notice letter that was sent to the Local 150 membership from William Dugan.  Please provide the USPS-generated documentation or other supporting documentation that shows the mailing date and cost.

12) A complete copy of the Information Technology Audit Report along with the name of the consulting firm and/or the consultant that performed the March 2007 audit of the Local's Information Technology System as a result of the security breach of the Local's computer systems.

13) A listing, electronic if available, containing the names of all Comet class attendees during the period January 1, 2006 through December 31, 2007.

# RETURN OF SERVICE

I hereby certify that a duplicate original of
the within subpoena was

*duly served*
*Indicate by check*
*method used:*

☒ in person.

☐ by leaving at principal office
or place of business, to wit:

For local 150

Dale Pierce Legal Counsel

on the person named herein on:

March 14, 2008

(Month, day, year)

Wendell McGee Jr.

(Name of person making service)

Investigator

(Official title)

- - - - - - - - - -

Check applicable boxes:

☒ I certify that the person named herein was
in attendance as a witness on: Margo Feinberg

☐ provided the records named herein

on: _____

(Month, day or days, and year)

_____

(Name of person certifying)

_____

(Official title)

CASE NUMBER 310-22982(01)

# Exhibit F

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL UNION OF OPERATING | ) | |
| ENGINEERS, LOCAL 150, AFL-CIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| JOSEPH P. WARD, THOMAS WARD, ROGER | ) | |
| F. ALLEN, C. WAYNE SNIDER, RESEARCH | ) | NO. 07 C 2779 |
| CENTER, SOMMERS & FAHRENBACH, INC., | ) | |
| TEAM 150 PARTY, INC., JOHN DOE | ) | |
| MAILING SHOP, and JOHN DOE PRINTER | ) | |
| | ) | |
| Defendants. | ) | |

**AGREED PROTECTIVE ORDER CONCERNING**
**CONFIDENTIAL DOCUMENTS AND PRESERVATION ORDER**

**I.    DEFINITIONS**

When used in this Protective Order:

A.    The singular includes the plural, and vice versa.

B.    "Communicate" (or variants of this verb) means to disclose, show, give, provide,
make available, furnish or allow exposure of information in any fashion to any Person.

C.    "Confidential Information" means any of the following:

   i.    any Party's marketing or campaign strategies;

   ii.    any Party's membership lists;

   iii.    any Party's Financial Information;

   iv.    any Document or Copy thereof that a Party's counsel believes, in good
         faith, falls within the coverage and scope of any prior and/or existing

non-disclosure agreement(s) used by that Party to protect the information

contained in such Document or Copy thereof; and

v.      any Document or Copy thereof that a Party's counsel believes, in good

faith, constitutes that Party's "trade secret", as defined in 765 ILCS

1065/2 (2008).

The materials defined as Confidential Information herein are entitled to protection because each

Party must make reasonable efforts to keep its Confidential Information secret, each Party's

Confidential Information is valuable to that Party, and the Confidential Information derives its

value from not being generally known to other parties or persons who can obtain economic value

from its disclosure or use.

D.      "Copy" means a reproduction made through any process, including photostatic or

photographic reproduction, manual recopying, microfilm, dictation, or mechanical or electronic

duplication.

E.      "Document" means any written, printed, typed, recorded or graphic matter, and

Copies thereof including, without limitation, any drawing, graph, chart, photograph, data

compilation, invoice, purchase order, contract, correspondence, note, or any writing or other

tangible thing that constitutes or contains matters within the scope of discovery under the

Federal Rules of Civil Procedure.  "Document" shall include any and all electronic documents in

any form.

F.      "Financial Information" means all information regarding (i) the income, revenue,

sales, profits, or expenses of a Party, or (ii) the fees and charges related to any good or service

offered by a Party.

2

G.     "Party" means: (1) International Union of Operating Engineers, Local 150,

AFL-CIO; (2) Joseph P. Ward; (3) Thomas Ward; (4) Roger F. Allen; (5) C. Wayne Snider; (6)

Fako & Associates; (7) Sommers & Fahrenbach, Inc.; and (8) Team 150 Party, Inc.

H.     "Person" means any natural person or any legal business or entity, other than a

Party.

I.     "Qualified Person" means any of the following:

i.     Any counsel for the Parties AND their staff (associate attorneys,
paralegals, law clerks) by one of the following firms, who is providing
legal services to a Party in connection with this litigation: Mudd Law
Offices; and Wildman, Harrold, Allen & Dixon, LLP;

ii.     Any judicial person involved in this action and any member of his or her
staff; and

iii.     The definition of "Qualified Person" includes only the Persons
specifically defined as such; it does not include any of the Parties, nor
does it include any of their officers, directors or employees.

iv.     The Parties may, by written agreement, agree to expand or retract the
definition of "Qualified Person" as needed during the course of this
litigation.  However, the definition of "Qualified Person" at no time shall
ever include any of the Parties or any of their officers, directors or
employees.

## II.     DESIGNATION OF CONFIDENTIAL INFORMATION

A.      Counsel for a Party, upon good faith and reasonable inquiry, may designate as confidential any Document or Copy thereof which contains Confidential Information.  Each Document designated by Counsel as confidential shall be identified on a list of such documents ("Confidential Document List"), and each document listed in the Confidential Document List shall be accompanied by the following information prepared by the party designating the Document as confidential:

1.      A general description of the information claimed to be confidential by the producing party (e.g., membership lists; research information; or telephonic survey reports);

2.      An explanation of why the information is entitled to confidential treatment;

3.      A description of how and where the information is stored; and,

4.      Explanation of why the producing party believes that the information was not generally or publicly known to individuals in the industry.

The items listed in paragraphs one (1) through four (4) above shall not be deemed to be confidential and shall be provided to each Party by its Counsel. Once a Document has been designated in the manner specified in this section above (e.g. providing information in 1-4), such Confidential Information shall be entitled to all the protections provided under this Protective Order.  However, should a Party dispute or contest the designation of a Document as confidential, that Party may request from the Party designating a Document confidential the following:

5.     An explanation of how and why the information was made known to individual recipients;

6.     A description of all individuals who have or have had access to the information (e.g., management employees, officers, agents, salesmen, independent contractors, customer representatives, unrelated third parties).

The items listed in paragraphs five (5) and six (6) shall be deemed confidential under the terms of this Order unless and until modified by agreement or a subsequent order or ruling.  The request of additional information listed in (5) and (6) does not affect the confidentiality of any Document under the terms of this Protective Order unless and until modified by agreement or a subsequent order or ruling.

B.     Any Document or Copy designated as containing Confidential Information must contain a stamp bearing the legend "CONFIDENTIAL" and/or "ATTORNEYS' EYES ONLY" in a prominent and conspicuous location.

C.     A Party's counsel may designate any Document or Copy thereof that is sought, obtained, or referred to in the course of a deposition as Confidential Information by verbally stating on the record at the deposition that the Document or Copy thereof constitutes Confidential Information and is subject to the provisions of this Protective Order.  A Party's counsel may also subsequently designate any Document or Copy thereof that is disclosed at such deposition as Confidential Information by notifying the other Party in writing of the specific pages of each Document or Copy that contains the Confidential Information within 21 days after receipt of the deposition transcript and exhibits.  All Documents and Copies designated as Confidential Information must be marked in accordance with Section II.B of this Protective

Order as soon as is reasonably practicable.  The entire deposition and all deposition exhibits shall be treated as Confidential Information under the terms of this Protective Order prior to the expiration of the aforementioned 21-day period.  Each Party shall attach a Copy of such written notification to the transcript and to each Copy thereof in his or her respective possession, custody or control.  To the extent possible, the court reporter shall prepare both a complete transcript that is marked "Contains Confidential Information" and a separate transcript that is marked "Confidential Information Redacted" that has blank spaces corresponding to the location where the designated Confidential Information appears in the complete transcript.  If during the course of a deposition testimony is elicited which is designated Confidential Information, anyone other than the deponent, the court reporter, and previously designated Qualified Persons will be excluded for the duration of such designated testimony.

D.     A Party may designate any Document or Copy thereof that is obtained from a nonparty to this lawsuit ("Third Party Documents") as Confidential Information by (1) giving written notice to the other Party that the designated Third Party Documents are confidential and that they originated with the Party claiming those Third Party Documents to be confidential; and (2) marking all Documents and Copies designated as Confidential Information in accordance with Section II.B of this Protective Order as soon as is reasonably practicable.

E.     Any and all Documents and Copies thereof designated as "ATTORNEYS' EYES ONLY" shall be treated as having been designated "CONFIDENTIAL" and thereby be subject to all provisions this Protective Order AND shall be further restricted by not being furnished, shown or otherwise disclosed to any person except the following Qualified Persons: counsel for the Parties AND their staff (associate attorneys, paralegals, law clerks).

F.      Before any person, other than Qualified Persons,  receives or reviews any Documents and Copies thereof designated in accordance with II.B of this Protective Order, he or she shall be provided with a copy of this Protective Order and shall agree in writing to be bound by its terms.

G.      Any oversight in identifying any page(s) of any Documents or Copies as "CONFIDENTIAL" shall not waive treatment as Confidential Information if the other Party should have reasonably understood the page(s) to be treated as Confidential Information.

## III.    OBJECTIONS TO DESIGNATION OF CONFIDENTIAL INFORMATION

A.      Unless and until otherwise ordered by the Court or agreed to in writing by the Parties, any Document or Copy thereof that is designated as containing Confidential Information under the terms of this Protective Order shall be treated as confidential by all Parties and shall not be disclosed except to Qualified Persons, under the terms specified in this Protective Order.

B.      In the event that any Party objects to the designation of any Document or Copy thereof as Confidential Information, such Party may, in writing, request the designating Party to revoke such designation, in writing, and to remove, modify or strike out any "CONFIDENTIAL" and/or "ATTORNEYS' EYES ONLY" marking that may have been placed on the objected-to Document or Copy thereof.  Such written request shall specifically identify the Document or Copy thereof at issue.

C.      The designating Party shall respond in writing within ten (10) business days of receipt of any written request pursuant to IV.B. of this Protective Order, or within such other period of time as stated by the Court or by the Parties' agreement.  If the designating Party refuses to revoke such designation, then the designating Party shall state in its written refusal the

7

reason for such refusal.  Notwithstanding the foregoing, the failure to provide a timely written response shall be deemed a refusal of the request.

D.      If the designating Party refuses to revoke or fails to respond to a request to revoke a Confidential Information designation, any Party may file a motion for an order requiring the designating Party to revoke such designation, in writing, and to remove, modify or strike out any "CONFIDENTIAL" and/or "ATTORNEYS' EYES ONLY" marking that may have been placed on the objected-to Document or Copy thereof.  If such a motion is filed, it shall be the objecting Party's burden to establish that the Document or Copy thereof is not Confidential Information within the meaning of this Protective Order.  In the event of such a motion, the Document or Copy thereof at issue may be submitted to the Court for inspection *in camera*.

## IV.      DISCLOSURE OF CONFIDENTIAL INFORMATION

A.      Except as provided herein, none of the Qualified Persons receiving Confidential Information from the other Party shall communicate any such Confidential Information to anyone other than a Qualified Person.

B.      All Confidential Information produced or exchanged in the course of this litigation shall be used only for purposes of prosecuting and/or defending against this litigation and shall not be used for any business, competitive or commercial purpose, or any other purposes by or on behalf of any Party or other Person to whom it is disclosed.

C.      Qualified Persons who receive Confidential Information shall be required to keep such information separate and inaccessible to any Persons except Qualified Persons.

D.      All copies, reproductions, extracts and summaries of documents, answers to interrogatories, responses to requests for admission, testimony and other materials and

8

information, as well as briefs and other Court papers that quote or refer to Confidential Information and/or Documents or materials containing such Confidential Information, shall also be subject to the provisions of this Protective Order.

## V.    FILING UNDER SEAL

A.    All parties must have leave of Court before filing any documents under seal. Confidential Information shall not be filed with the Court except where required in connection with any motion, hearing, conference or trial pending before the Court.  Such Confidential Information shall not be filed with the Clerk of the Court.  When filing a motion to request leave to file a document under seal, the party shall submit the documents containing Confidential Information that require the Court's review to chambers in camera in a sealed envelope bearing the caption of the case, case number, the title of the motion or response to which the submitted Document pertains, and the name and telephone number of counsel submitting the Document. The producing party shall maintain the original Document intact for any further review.  Unless ordered otherwise by the Court, a redacted copy of the Documents filed under seal shall be filed with the Clerk of the Court for the record.

B.    Neither the designation of any Document or Copy thereof as Confidential Information under the provisions of this Protective Order, nor the filing of any Document or Copy thereof under seal pursuant to the provisions of this Protective Order or otherwise, shall prevent the use, in open court, at any hearing, or at the trial of this case, of any Document or Copy thereof **PROVIDED THAT** the portion of the hearing and/or trial using such Document or Copy thereof be held *in camera* and/or closed to the public.  Further, the designating Party may request that any non-Qualified Persons be excluded from that portion of the hearing and/or

trial.  In any case, the Party desiring such use must provide the relevant producing Party advance

notice of its intentions in writing in no less than three (3) business days.

## VI.    INADVERTENT DISCLOSURE

A.    No Party is required to treat any Document or Copy thereof as Confidential

Information unless and until designated as Confidential Information by the disclosing Party

pursuant to the terms of this Protective Order.

B.    The inadvertent or unintentional disclosure of Confidential Information marked

"CONFIDENTIAL" or "ATTORNEYS' EYES ONLY", produced after the effective date of this

Protective Order, regardless of whether the information was so designated at the time of

disclosure, shall not be deemed a waiver in whole or in part of a Party's claim of confidentiality

either as to specific information disclosed therein or on the same or related subject matter,

provided that the Party asserting the claim of confidentiality informs the opposing Party of its

claim within a reasonable time after learning of the disclosure.

C.    Should any Confidential Information be disclosed by a receiving Party, through

inadvertence or otherwise, to any Person not authorized to receive it under this Protective Order,

the Party inadvertently disclosing such Confidential Information shall promptly (a) identify the

recipient and the circumstances of the unauthorized disclosure to the disclosing Party and (b) use

best efforts to bind the recipient to the terms of this Protective Order.  No Confidential

Information shall lose its status as Confidential Information if disclosed to a Person not

authorized to receive it under this Protective Order.

## VII.   AMENDMENT

This Protective Order may be amended by written agreement of the Parties, through themselves and/or their counsel, in the form of a stipulated order, provided the amendment meets with the Court's approval.

## VIII.   CONFIDENTIALITY MEASURES

The Qualified Persons are responsible for employing measures to control, consistent with this Protective Order, the use, duplication, and/or distribution, as well as access to, any dissemination of Confidential Information.  Qualified Persons shall not duplicate any Confidential Information except to the extent consistent with the provisions herein.

## IX.   DESTRUCTION OF CONFIDENTIAL INFORMATION

A.      Within thirty (30) days after the conclusion of this litigation, including the exhaustion of all appeals, all Documents and Copies thereof designated as containing Confidential Information shall be destroyed or returned to the original designating Party.  This Protective Order and all of its provisions shall continue to be binding after the conclusion of this litigation.  This provision shall not apply to Copies of pleadings, summaries or briefs maintained by the Parties' counsel in their respective litigation files maintained in the ordinary course of business.

B.      After meeting its obligations pursuant to IX.A., each party shall deliver to the opposing party an affidavit certifying that all received Confidential Information, Documents and Copies thereof containing any designated Confidential Information, and any and all excerpts from and summaries of such Confidential Information have been returned to the party who disclosed such Confidential Information and/or destroyed.

C.      Within 63 days after the case is closed, the parties should file a motion to retrieve any documents previously filed under seal.  If the parties do not file a motion within that time period, any documents filed under seal will become part of the public record.

## X.      PRESERVATION OF CERTAIN ELECTRONIC EVIDENCE

The parties hereby agree to preserve any and all electronic data and computer systems (on a sector by sector basis) likely to contain relevant information to this litigation and be enjoined from destroying or causing to be destroyed or allowing the destruction of any such information.  Nothing in this Protective Order shall require any party to disclose or produce the preserved material; as such a determination will be made in the discovery process and by Court Order.  However, in the event a party discloses said material, it may be deemed confidential under the terms of this Protective Order and this Protective Order shall apply.

## XI.      AUTHORIZATION FOR DISCLOSURE

Subject to compliance with the terms of this Protective Order, the Parties are authorized to disclose, for purposes of this Litigation only, any document requested to be produced by any other Party or that should be produced to any other Party under the Federal Rules of Civil Procedure.

## XII.      ADDITIONAL PROVISIONS

A.      Nothing in this Protective Order shall be construed to affect the admissibility of any document, material, or information at any trial or hearing.

B.      Any request for confidentiality, closure, or sealing of any hearing must be made to the judge then presiding.

C.    Nothing in this Protective Order shall diminish, eliminate or otherwise affect any claim or position that any Party may assert, or has asserted, in this case.

D.    The designation of any Document or Copy thereof as Confidential Information and/or the failure of any Party to challenge such a designation by another Party shall have no meaning or effect whatsoever with respect to the substantive issues in this litigation or with respect to the claims or defenses of any Party hereto and shall not be construed as an admission or agreement that any specific Document or Copy thereof is or is not confidential and/or proprietary or does not constitute a Party's trade secret.

E.    The terms of this Protective Order shall become effective upon execution by the respective attorneys for the Parties.  Upon entry of this Protective Order by the Court, the entered Order shall supersede the prior stipulation executed by the Parties.

F.    Nothing contained in this Protective Order bars or restricts the Parties' attorneys from rendering advice to their respective clients with respect to this litigation.

G.    Nothing contained in this Protective Order shall preclude or prevent any Party from seeking a greater degree of protection for any Document or Copy thereof either by stipulation or by court order.

IT IS SO ORDERED:

_____
The Honorable Amy St. Eve

Dated:  March 5, 2008

**WE HEREBY AGREE AND STIPULATE TO THE ENTRY OF THE ABOVE ORDER.**

Plaintiff International Union of Operating Engineers, Local 150, AFL-CIO\

By:_____
        William J. Cook

William J. Cook
Katherine K. Ivers
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive
Chicago, IL  60606-1229
(312) 201-2000
Facsimile:  (312) 201-2555

Defendants Joseph P. Ward, Thomas Ward, Roger F. Allen, C. Wayne Snider, and Team 150
Party, Inc.

By:_____
        Charles Lee Mudd Jr.

Charles Lee Mudd Jr.
Mudd Law Offices
3114 West Irving Park Road
Chicago, Illinois 60618
773.588.5410
773.588.5440 (facsimile)

14

## <u>CERTIFICATE</u> <u>OF</u> <u>SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing has been duly mailed via

United States First Class Mail this _____day of February 2008 addressed to:


To:     John S. Letchinger
        William J. Cook
        Wildman, Harrold, Allen & Dixon, LLP
        225 West Wacker Drive
        Suite 2900
        Chicago, IL  60606-1229
        (312) 201-2000


                                   _____
                                   Charles Lee Mudd Jr.

Charles Lee Mudd Jr.
Mudd Law Offices
3114 West Irving Park Road
Chicago, Illinois 60618
773.588.5410
773.588.5440 (facsimile)